**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Oscar T. Brookins, individually and as the representative of a class of similarly situated persons, and on behalf of The Northeastern University Retirement Plan, | Civil Action No.: |
|      Plaintiff, | COMPLAINT |
| V. | CLASS ACTION |
| NORTHEASTERN UNIVERSITY; NORTHEASTERN UNIVERSITY 403(b) INVESTMENT COMMITTEE; and JOHN and JANE DOES 1-10, | |
|      Defendants. | |

## NATURE OF THE ACTION

Plaintiff Oscar T. Brookins brings this class action lawsuit on behalf of his retirement plan, himself, and other similarly situated individuals. Defendants Northeastern University, Northeastern's 403(b) Investment Committee ("the Committee"), and John and Jane Does 1-10 (collectively, "Defendants"), are fiduciaries of the retirement plan of which Plaintiff is a participant. As described herein, Defendants have breached their fiduciary duties to the Plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), to the detriment of the Plan, its participants, and its beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

1.      This is a class action complaint against Northeastern University and all other Defendants to challenge their repeated failure to administer the Plan prudently or monitor fiduciaries and service providers to the Plan. Plaintiff sues pursuant to ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132 and alleges as follows.

-1-

2.      ERISA imposes a range of strict fiduciary duties in order to safeguard plan

participants like Plaintiff. Fiduciaries—like the Defendants—are subject to strict duties of loyalty

and prudence. They must act "solely in the interest of the participants and beneficiaries," 29

U.S.C. § 1104(a)(1)(A) and with the "care, skill, prudence, and diligence" expected in managing

a plan of similar scope. *Id.* § 1104(a)(1)(B). These fiduciary duties are among "the highest

known to the law." *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d

296, 304-05 (D. Mass. 2013).

3.      Ensuring that ERISA fiduciaries prudently manage defined contribution ("DC")

plans in particular is increasingly important. As of the fourth quarter of 2021, Americans had

approximately $11 trillion in such plans—403(b) plans, like the Plan, more common 401(k)

plans, and similar vehicles.[1] While defined benefit ("DB") plans, or traditional pensions, were

the predominant retirement vehicle for previous generations, less than a quarter of Generation X,

Millennials, and Generation Z retirees are expected to receive any traditional pension income.[2]

By contrast, two-thirds of workplaces that offer retirement plans offer DC plans.[3]

4.      At the same time, imprudent and disloyal mismanagement often harms DC plan

participants much more than those in DB plans. Employers sponsoring DB plans must stand

behind the promised benefit amount and are therefore ultimately responsible for remedying

fiduciaries' breaches before participants experience harm: "In a defined-benefit plan, retirees

---

[1] *See* Investment Company Institute [ICI], Defined Contribution Plan Participants' Activities, 2021 at 7 (Apr. 2022), *available at* https://www.ici.org/system/files/2022-04/21_rpt_recsurveyq4.pdf. While the Plan is a 403(b) plan, not a 401(k) plan, the two types of plans operate largely the same in practice and the legal framework applicable to 403(b) plan fiduciaries is materially identical. *See generally*, *e.g., Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019).

[2] *See* Report on Secure Retirement Institute FactBook: https://401kspecialistmag.com/11-eyebrow-raising-facts-from-the-secure-retirement-institute-chapter-1/). When Congress enacted ERISA, there were more than twice as many DB participants as DC participants. Today, there are almost seven times as many DC participants. Cong. Research Serv., *A Visual Depiction of the Shift from Defined Benefit (DB) to Defined Contribution (DC) Pension Plans in the Private Sector* (Dec. 27, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12007.

[3] Cong. Research Serv., *supra* n.2 at 1.

receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). Employers therefore have strong incentives to reduce fees and eliminate underperforming investments. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). In DC plans by contrast, employers do not guarantee any level of benefits, and participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015); *see also Hughes v. Nw. Univ.,* 142 S. Ct. 737, 740 (2022) ("Each participant chooses how to invest her funds, subject to an important limitation: She may choose only from the menu of options selected by the plan administrators . . ."); 29 U.S.C. § 1002(34). Because employers and other fiduciaries bear no risk, they lack incentive to police costs and investment performance.

5.      The Department of Labor has emphasized that investment options' fees and underperformance can have a pronounced effect on workers' ability to retire securely. For example, a difference of 1% in annual fees can dramatically impact retirement. A worker paying 1.5% instead of 0.5% in fees and earning 7% on an initial $25,000 balance can expect her assets will be nearly *30% lower* after 35 years, adding up to $100,000 less to retire on.[4] That worker can expect a lower quality of life in retirement or may be forced to work extra years to make up for the lost opportunity. Such an outcome is even worse if she earns less than 7% in performance.

6.      Despite these high stakes, despite being subject to ERISA's strict fiduciary duties, and despite the serious potential for harm to Plaintiff and other participants, Defendants utterly failed to employ a prudent process for managing the Plan.

---

[4] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

7.      Northeastern University sponsors a retirement plan for its employees—the Northeastern University Retirement Plan.

8.      Defendants' mismanagement of the Plan has cost participants millions of dollars, leading to their paying excess fees and losing out on retirement income. As detailed below, Defendants limited the Plan's participants to low-performing, high-cost investment options such as the consistently underperforming CREF Stock Account (which by itself accounts for over 10% of the Plan's assets invested) or the costly TIAA Real Estate Account. They also subjected participants to dramatically high recordkeeping costs over several years in the class period, well higher than similar plans. Moreover, many of these options were flagged as imprudent in prior ERISA litigation of which Defendants could and should have been aware.

9.      Courts have frequently concluded that such conduct is sufficient to state a claim for breach of fiduciary duty. *See Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d. 252, 259 (D. Mass. 2018) (plaintiff sufficiently pled claim for fiduciary breach by "plausibly alleg[ing] that the higher fees were unjustified or otherwise improper"); *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-CV-10397-GAO, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("[T]he long-term retention of a substantial number of underperforming funds at higher than comparable costs gives rise to a plausible inference of an objectively imprudent monitoring process.").

10.     At all times during the Class Period, the Plan had at least $1.3 billion in assets under management. At the end of 2018, 2019, and 2020 it had net assets of approximately $1.5 billion, $1.7 billion, and $1.9 billion, respectively.[5] These assets all were, and continue to be, entrusted to the care of the Plan's fiduciaries, including Defendants.

---

[5] For 2020, the Plan reported over $1.955 billion in assets available for benefits and 8,335 participants with account balances at year-end. *See* December 31, 2020 Form 5500, filed with the DOL at 2, 29, 44. The 2020 Form 5500 is the most recent on file.

11.     The Plan's assets under management rank it among the top 0.1% of all DC plans.[6]
Plans this large have outsized bargaining power in the marketplace for DC plan services and
greater control over the fees and expenses charged against participants' investments. *See Pinnell
v. Teva Pharms. USA, Inc.*, No. CV 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020).
Defendants, however, did not prudently use this power to ensure participants had access to the
best investment options and reduce the Plan's expenses.

12.     Based on this and other conduct detailed below, Plaintiff asserts claims against
Defendants for breaching their fiduciary duty of prudence (Count One). Plaintiff also asserts a
claim against Defendant Northeastern University for its failure to monitor other fiduciaries
(Count Two).

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
§ 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29
U.S.C. § 1332(e)(1), because it is an action brought under Title I of ERISA, 29 U.S.C. § 1001, *et
seq.* Plaintiff brings this action pursuant to ERISA Section 502(a)(2) and (3), 29 U.S.C.
§ 1132(a)(2) and (3), which authorize employee retirement plan participants to bring civil actions
on behalf of their Plan to remedy breaches of fiduciary duties and other prohibited conduct, and
to obtain monetary and appropriate equitable relief as set forth in ERISA Section 409 and 502,
29 U.S.C. §§ 1109 and 1132.

14.     This Court has personal jurisdiction over Defendants because they transact
business in this District, reside in this District, and/or have significant contacts with this District.
This Court also has personal jurisdiction over Defendants because ERISA provides for
nationwide service of process.

---

[6] ICI, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k)
Plans, 2018*, at 8 (July 2021), *available at* https://www.ici.org/system/files/2021-
07/21_ppr_dcplan_profile_401k.pdf (stating that, out of 586,622 401(k) plans on record with the
DOL in 2018, only 659 had over $1 billion in assets). The ICI is a leading trade association for
the mutual fund industry. *Id.* at 80.

15.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the ERISA violations occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

16.     Plaintiff Oscar T. Brookins resides in Boston, Massachusetts. During his employment, Plaintiff Brookins participated in the Plan, investing in the options offered under the Plan and which are the subject of this lawsuit. Plaintiff Brookins has been financially injured by the unlawful conduct described herein. Plaintiff Brookins's account would be worth more today had Defendants not violated ERISA as described herein.

17.     Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

18.     Plaintiff lacked knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and otherwise engaged in conduct violating ERISA until shortly before he filed suit. These material facts consisted of information such as the investment alternatives that Defendants could have made available within the Plan, the costs and investment performance of existing options compared to potential alternatives that Defendants could have made available, the plan costs he experienced and the costs for similarly sized plans, information regarding different share classes of investments that could have been made available, as well as information for costs and performance of different types of available investments.

**Defendants**

19.     Defendant Northeastern University is a private university and educational institution headquartered in Suffolk County, Massachusetts. Northeastern's principal place of business is 360 Huntington Ave., Boston, Massachusetts  02115-5005. *See* 2020 Form 5500 at 1.

20.     Northeastern University is the "plan sponsor" of the Plan within the meaning of ERISA Section 3(16)(B), 29 U.S.C. § 1002(16)(B).[7] Northeastern is also a "named fiduciary" pursuant to ERISA Section 402(a), 29 U.S.C. § 1102(a) because it has the ultimate authority to control and manage the operation and administration of the Plan. Moreover, because Northeastern exercises discretionary authority or control with respect to management and administration of the Plan and disposition of the Plan's assets, Northeastern is a functional fiduciary under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

21.     The Board of Trustees is Northeastern's governing body. The school's website provides that: "The board appoints the president, who leads and manages the university, and works with senior leaders to shape the university's strategic vision. The board also approves Northeastern's mission, budget, policies, and significant changes to academic programs, and oversees the university's finances and assets." Northeastern University, *Board of Trustees*, https://www.northeastern.edu/about/board-of-trustees/ (last visited June 27, 2022).

22.     Northeastern's 403(b) Investment Committee serves as the Plan Administrator for the Plan. 2020 Form 5500 at 31 (Auditor's Report n.1).

23.     On information and belief, Northeastern as Plan Sponsor and Named Fiduciary appointed fiduciaries of the Plan. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

24.     Northeastern, acting through its Board of Trustees and other leadership, had a fiduciary duty to monitor and supervise the Plan's fiduciaries, including the 403(b) Investment

---

[7] *See* 2020 Form 5500 at 1, 31 (Audit Report, Note 1).

Committee and its members during the Class Period, but, as set forth in detail below, the Plan's fiduciaries failed to carry out their duties prudently.

25.     For the foregoing reasons, at all times during the Class Period, Northeastern was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of Plan assets and exercised discretionary authority to appoint and/or monitor the other fiduciaries, which in turn had control over Plan management and/or authority or control over management or disposition of Plan assets. While Plaintiff has not named individual Trustees or other Northeastern leadership as Defendants, Plaintiff reserves the right to do so based on information obtained through discovery.

**John Doe Defendants**

26.     To the extent that there are additional officers, employees, board members, administrators, and/or contractors of Northeastern who are/were fiduciaries of the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include, but are not limited to, Northeastern officers, employees, board members, administrators, and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLAN AND ITS ADMINISTRATION

27.     The Plan is a defined contribution or individual account plan that includes a cash or deferred arrangement. It is an "employee pension benefit plan" within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), covering eligible current and former Northeastern employees, including Plaintiff. The Plan is a qualified plan under 26 U.S.C. § 403, commonly referred to as a "403(b) plan."

28.     The Plan was established July 1, 1946 and was most recently amended January 1, 2019. 2020 Form 5500 at 31 (auditor's report n.1); Northeastern University Retirement Plan Summary Plan Description ("SPD") at 15.

29.     Northeastern University is the Plan Sponsor for the Plan. 2020 Form 5500 at 1, 31 (auditor's report n.1); *see also* SPD at 15.

30.     Northeastern is also the Plan Administrator for the Plan. SPD at 15-16.

31.     A participant's account consists of the sum of his or her contributions and the employer's matching contributions. 2020 Form 5500 at 31 (auditor's report n.1); SPD at 6.

32.     Retirement benefits provided by the Plan are based solely on the amounts contributed to a participant account, and any income or gains (or losses) on such contributions, less any expense that may be allocated to such participant's account. *See* SPD at 5-6.

33.     Fidelity Management Trust Company ("Fidelity"), Teachers Insurance and Annuity Association ("TIAA") and College Retirement Equities Fund ("CREF") and TIAA as agent for TIAA FSB are the Plan Custodians. 2020 Form 5500 at 40 (2020 Auditor's Report, n.6).

**Eligibility**

34.     An employee is eligible to participate in the Plan immediately upon hiring, provided the employee is not enrolled as a student and regularly attending classes offered by Northeastern. SPD at 1.

35.     Temporary, non-student employees who work in a non-benefits eligible position for a specified limited period of time are eligible to participate but excluded from purposes of employer matching contributions. SPD at 2.

**Contributions and Vesting**

36.     Once an eligible employee enrolls, the school reduces their pay by the amount the employee specifies, subject to IRS limits. SPD at 3. Northeastern makes a matching contribution equal to 10% of the employee's compensation, provided elective deferrals equal or exceed 5% of the employee's compensation. SPD at 4. For employees 50 and older who make catch-up

deferrals, Northeastern increases the employer contribution accordingly. *Id.* Both employee and employer contributions vest immediately. *Id.* at 6.

37.     According to the Plan's 2020 Form 5500, employer contributions totaled $36,897,967. Like other employers, Northeastern enjoys significant benefits from sponsoring the Plan, including benefiting from increased employee recruitment and reduced turnover.

**The Plan's Investments**

38.     The Plan allows participants to invest in several mutual funds, including Target Date Funds (funds that in turn invest in a mix of equity and fixed income investments ostensibly balanced based on the investor's time until retirement).

39.     Upon enrollment, a participant has a choice of account custodians between Fidelity and TIAA.[8]

40.     Overall, the Plan includes over 60 options, of which 13 are Fidelity "Freedom" Target Date Funds and 11 are TIAA's "Lifecycle" Target Date Funds. 2020 Form 5500 at 45-46. The vast majority of options are either Fidelity or TIAA funds, variable annuities, or investment contracts, with only 11 funds from outside of the two families.[9]

41.     As alleged below, Defendants failed to prudently manage the Plan's investment options.

---

[8] This and other features of the Plan are discussed in a report prepared by a committee of Northeastern professors working with the Faculty Senate. *See* Report of the 2020-2021 Financial Affairs Committee (April 11, 2021), *available at* https://faculty.northeastern.edu/app/uploads/sites/2/2021/04/FAC_Report_4.11.21.pdf (last visited June 27, 2022).

[9] Several funds appear to be offered by each custodian and are listed twice on the Form 5500. *See infra* ¶ 19 & n.14.

The Plan also offers participants self-directed brokerage options, under which they may invest their retirement funds in a broader range of options in the marketplace. *See generally* ERISA Advisory Council on Employee Welfare and Pension Benefit Plans, *Report to the Honorable Marty Walsh, US Sec'y of Labor, Understanding Brokerage Windows in Self-Directed Retirement Plans* (Dec. 2021), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-advisory-council/2021-understanding-brokerage-windows-in-self-directed-retirement-plans.pdf.

**Payment of Plan Expenses**

42. During the Class Period, administrative and investment expenses paid using Plan assets were reported on the Plan's Form 5500.

**ERISA Fiduciary Duties**

43. ERISA imposes strict fiduciary duties, including duties of loyalty and prudence, upon retirement plan fiduciaries like defendants here. ERISA Section 404, 29 U.S.C. § 1104(a)(1) provides: "[A] fiduciary shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and (D) in accordance with the documents and instruments governing the plan." *See also Hughes*, 142 S. Ct. at 739.

44. "[T]he twin duties of loyalty and prudence,' . . . are among 'the highest known to the law.'" *Glass Dimensions, Inc.*, 931 F. Supp. 2d at 304-05 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009)); *see also Sweda*, 923 F.3d at 333.

45. ERISA's "prudent person" standard serves "to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). Recently, the Supreme Court emphasized that this standard imposes a "continuing duty of some kind to monitor investments and remove imprudent ones." *Hughes*, 142 S. Ct. at 741 (quoting *Tibble*, 575 U.S. at 530). Fiduciaries must exercise prudence in selecting investments and are also subject to a "continuing duty to monitor [plan] investments and remove imprudent ones," which exists "separate and apart" from the duty with respect to the initial selection. *Tibble*, 575 U.S. at 529. They must dispose of any imprudent investments within a reasonable time and may be held liable either for "assembling an imprudent menu of investment options" or "failing to monitor the plan's investment options to ensure that each

option remains prudent." *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008)

(citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

46.     A fiduciary must ensure that *each* investment option is and remains prudent, and

cannot defend by arguing that it has offered some prudent investments along with imprudent

investments. *Hughes*, 142 S. Ct. at 741-42. "[A] fiduciary cannot free himself from his duty to

act as a prudent man simply by arguing that other funds" available within the plan could have

"theoretically . . . create[d] a prudent portfolio." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d

283, 289 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

47.     ERISA also requires Plan fiduciaries to act in accordance with Plan documents.

Any violation of the terms of plan documents constitutes a fiduciary breach. *Dardaganis v.

Grace Capital, Inc.*, 664 F. Supp. 105, 108 (S.D.N.Y. 1987), *aff'd* 889 F.2d 1237 (2d Cir. 1989);

*see also Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F. 3d 59, 64 (1st Cir. 2014)

("[A] fiduciary 'must act in accordance with the documents and instruments governing the plan

insofar as they accord with the statute.'") (quoting *US Airways, Inc. v. McCutchen*, 133 S. Ct.

1537, 1548 (2013)).

## DEFENDANTS' ERISA VIOLATIONS

**A.**     **Defendants Caused Participants to Incur Unreasonable Fees During the Class Period**

48.     As described above, Defendants were each fiduciaries of the Plan.

49.     Plaintiff lacked and continues to lack actual knowledge of Defendants' specific

decision-making process for managing the Plan, including their process for selecting and

monitoring Plan investments, as this information is in the sole possession of Defendants.

50.     Plaintiff has drawn reasonable inferences regarding these processes from the facts

set forth herein for purposes of this Complaint.

**(1)     Defendants Failed to Ensure the Plans' Recordkeeping Expenses Were
Reasonable**

51.     On information and belief, TIAA and Fidelity each provide the Plan a set of

administrative services, such as tracking participants' account balances and sending participants

communications, that collectively are described as "recordkeeping." *See generally Hughes*, 142 S. Ct. at 740. The market for recordkeeping services is competitive, and numerous recordkeepers in the marketplace are able to provide the same services at very little cost. Several services (such as processing Qualified Domestic Relations Orders, *see* 29 U.S.C. § 1056 (d)(3)(B)(i)) may even be a profit center for recordkeepers. Recordkeepers will compete to win contracts with DC plans, particularly those with many assets and/or large participant populations, like the Plan.

52.     Plan fiduciaries can arrange for recordkeeping to be paid directly by the plan sponsor or from the plan's assets. For those, like the Plan, paying from plan assets, payments may be made directly or through revenue sharing, under which investments within the plans make payments to the recordkeeper or to the plans directly for recordkeeping costs.

53.     While courts have recognized that fiduciaries' use of revenue sharing is not per se imprudent, they have noted that revenue sharing may hide the true scope of fees from participants and even from fiduciaries themselves. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F. 3d 327, 336-37 (8th Cir. 2014).

54.     Here, revenue sharing harmed the Plan's participants because it resulted in their being forced to pay above-market recordkeeping and administrative fees, which was hidden from their view. Indeed, the Plan's Form 5500 reports *negative* compensation to Fidelity, which obviously is not the case.

55.     In 2020, the Plan's Form 5500 filed with the DOL reported direct recordkeeping compensation to Fidelity of -$348,656. The Form had no entry for direct compensation to TIAA at all. 2020 Form 5500 at 9, 10. The Form reported that Fidelity also received indirect compensation (*i.e.,* revenue sharing). It also listed TIAA, CREF, and TIAA-CREF Mutual Funds as entities receiving only indirect compensation, along with other fund providers.

56.     Defendants also may have caused the Plan's participants to pay dramatically higher recordkeeping fees than participants in like plans and like circumstances, but their failure to report accurately the Plan's recordkeeping fees in annual filings renders this information unavailable until discovery occurs.

-13-

57.     NEPC, a consulting group, recently published the results of a survey of defined contribution plans, reporting on factors such as the fees plans paid. *See* NEPC, LLC, *NEPC 2021 Defined Contribution Plan Trends and Fee Survey Results* (Feb. 2022).[10] The group sampled 137 DC plans, with 1.6 million participants and $230 billion in aggregate assets. The median plan had $728 million in assets and 5,400 participants, similar to the Plan's asset and participant counts. *See* NEPC 2021 Report at 2; *see also supra* ¶ 10.

58.     NEPC's survey found that larger plans paid lower recordkeeping fees per participant, that half of surveyed plans with between 5,000 and 15,000 participants paid $40 to $55 per participant in recordkeeping fees, and that *no* such plans in the survey paid above $70. NEPC 2021 Report at 12. Comparable information is impossible to find from the Plan's public filings—the 2020 Form 5500 reports that Fidelity received *negative* compensation from the Plan, as noted above, and TIAA's full compensation is not detailed in the filing.

59.     Because the Plan's revenue sharing practices shielded the Plan's true costs and in light of Defendants' other breaches, Plaintiff anticipates that the Plan's total recordkeeping costs, once revealed through discovery, will reflect imprudence by the fiduciaries.

60.     To satisfy their duty of prudence, fiduciaries must evaluate all fees participants pay to a recordkeeper or other service provider on a continuing basis. *See* Dep't of Labor, *A Look at 401(k) Plan Fees* at 2. This requires an evaluation of every fee a service provider receives, whether through direct compensation or revenue sharing, and a prudent fiduciary should ensure any payments exceeding reasonable compensation are returned to the Plan. Here, the Form 5500 reports that Fidelity and TIAA returned some revenue to the Plan in 2020 (and participant statements likewise confirm this is the case), but the Form 5500 does not specify what those companies retained as compensation and whether such compensation was reasonable. *See* 2020 Form 5500 at 40 (auditor's n.6).

---

[10] *Available at* https://1o6eee2d0sv33mxg9d15cr4u-wpengine.netdna-ssl.com/institutional/wp-content/uploads/sites/4/2022/02/2021-NEPC-DC-Plan-Trends-and-Fee-Survey-Full-Results.pdf.

61.     Prudent fiduciaries also look externally, to the marketplace, to determine what comparable plans are paying their service providers and, consequently, what is reasonable compensation. Courts have held that this may require conducting a Request for Proposal process, issuing RFPs every three to five years as a matter of course or more often if benchmarking or other information shows the fees are unreasonable. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015). Industry participants, too, emphasize the importance of an RFP process. *See* NEPC, LLC, *NEPC 2020 Defined Contribution Progress Report* at 12.[11] ("While there is scale pricing, (i.e., larger plans can access lower fees), operational complexity and service levels drive meaningful differentiation in price. Best practice is to compare fees and services through a record-keeping vendor search Request for Proposal ("RFP") process.").[12] Obtaining market information is particularly important since fees in the retirement plan marketplace regularly show a downward trend. *See* ICI Report, *supra* n.6 at 49.

62.     Both ERISA and DOL regulations "require[] plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries." DOL 408(b)(2) Regulation Fact Sheet[13] at 1. In guidance to fiduciaries, the DOL has emphasized that staying informed about the marketplace is a key component of prudent conduct:

> "Responsible plan fiduciaries also must ensure that arrangements with their service
> providers are 'reasonable' and that only 'reasonable' compensation is paid for services.
> Fundamental to the ability of fiduciaries to discharge these obligations is obtaining

---

[11] *Available at* https://nepc.com/institutional/nepcs-2020-defined-contribution-plan-fee-survey/ (last visited June 27, 2022).

[12] The 2021 Faculty Senate committee report states that, in the committee's understanding, the choice of custodians "has undergone a competitive bid," but the report provides no details, and it is unclear if the Plan's fiduciaries undertook a full RFP process and, even if they did, whether it took place in the recent past. *See* Report, *supra* n.8, at 2.

[13] *Available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/factsheets/final-regulation-service-provider-disclosures-under-408b2.pdf.

information sufficient to enable them to make informed decisions about an employee

benefit plan's services, the costs of such services, and the service providers."

*Id.* (emphasis added).

63.     The facts available to Plaintiff—including that the Plan has retained the same

recordkeepers over the course of the Class Period and does not clearly report fees—support an

inference that Defendants failed to conduct RFPs at reasonable periods and otherwise failed

adequately to explore whether the Plan could obtain more favorable rates in the recordkeeping

marketplace, which is highly competitive and includes many firms capable of offering the same

levels of service. Indeed, Defendants ignored multiple red flags specific to TIAA and Fidelity, as

detailed herein, further indicating they failed to monitor these service providers.

64.     In light of the Plan's asset size and participant count, coupled with the trend

toward lower recordkeeping expenses, the competitive nature of the marketplace, and the fact

that multiple recordkeepers offer services similar to those used by the Plan, Plaintiff anticipates

that discovery will show the Plan could have obtained recordkeeping services of the same or

better quality at a lower cost.

**(2) <u>Defendants Failed to Act Meaningfully While Many of the Plan's Options Had
Excessive Investment Management Fees.</u>**

65.     Defendants also failed to prudently select and monitor the Plan's investment

options during the Class Period. These failures wasted the Plan's assets and harmed each

participant's ability to obtain a secure retirement through a combination of high fees and low

performance.

66.     In comparison to options in similarly sized plans, many of the Plan's investments

were significantly more expensive than comparable funds found in similarly sized plans.

67.     Indeed, a Senate Faculty committee composed of Northeastern professors

recognized this very issue in early 2021, recommending action to replace several funds in the

Plan, zeroing in on the Fidelity Freedom and TIAA Lifecycle funds. *See* Report, *supra* n.8, at 2-

5. The Report contains a detailed, sophisticated analysis of how Plan participants are

shortchanged by the high-cost options made available to them. In particular, the Report
highlights the expense ratios associated with the investment options to which Plan participants
are limited.

68.     Each fund in the Plan has an associated "expense ratio," reflecting the fee
investing participants are charged for investment management and other services. "The size of
the expense ratio varies based on a host of factors unique to each investment, such as the size of
the fund, the frequency of trading, and the complexity of its holdings." *Davis v. Washington
Univ. in St. Louis*, 960 F.3d 478 , 482 (8th Cir. 2020) (citing DOL guidance). The expense ratio
is based on a percentage of assets. An expense ratio of 0.5% means a participant will pay $5.00
annually for every $1000 in assets invested in that fund. The expense will then reduce the
participant's return and the compounding effect of that return, as outlined in the DOL's "A Look
at 401(k) Fees" guidance. *Supra* ¶ 60. This effect increases the importance of having prudent
fiduciaries monitoring investment fees and net performance.

69.     As the Report notes, Plan participants are subject to expense ratios that are too
high. It concludes: "the fact that we are not using the lowest expense ratio funds in the class, and
in particular in the lifecycle/target date fund investments is problematic. It essentially means a
good portion of our investments are going to these fund managers somewhat needlessly in a
quiet hidden way." *Id.* at 4.

70.     The Report compares the Fidelity and TIAA Target Date Funds to comparable
funds offered by Vanguard, noting that opting for high-cost funds rather than Vanguard's options
can result in tens of thousands of lost earnings over thirty years. The Report also points out that
the Vanguard offerings also performed *better* than the Fidelity and TIAA options. *Id.* at 4.

71.     As noted above, Defendants are responsible for monitoring the various investment
options made available to Plan participants. The Plan's Form 5500 lists the options, apparently
broken out by the custodian under which they are offered. As of December 31, 2020, the
following options were available to Plan participants who selected Fidelity (non-Fidelity funds
are bolded and italicized):

| Fund Name | Total Assets |
|---|---|
| Fidelity Mutual Funds – Fidelity Growth Company K | $77,961,220 |
| Fidelity Mutual Funds – Fidelity Freedom 2030 K | $62,325,481 |
| Fidelity Mutual Funds – Fidelity Freedom 2035 K | $51,764,026 |
| Fidelity Mutual Funds – Fidelity Contrafund K | $46,785,405 |
| Fidelity Mutual Funds – Fidelity Freedom 2025 K | $45,524,882 |
| Fidelity Mutual Funds – Fidelity 500 Index | $42,977,097 |
| Fidelity Mutual Funds – Fidelity Freedom 2020 K | $42,200,719 |
| Fidelity Mutual Funds – Fidelity Freedom 2040 K | $38,932,539 |
| *Vanguard Mutual Funds – Federal Money Market* | $27,830,479 |
| Fidelity Mutual Funds – Fidelity Freedom 2045 K | $27,734,279 |
| Fidelity Mutual Funds – Fidelity Total Market Index | $26,178,670 |
| Fidelity Mutual Funds – Fidelity Low Priced Stock K | $25,995,453 |
| Fidelity Mutual Funds – Fidelity Freedom 2050 K | $24,868,890 |
| Fidelity Mutual Funds – Fidelity Total Bond | $16,636,042 |
| Fidelity Mutual Funds – Fidelity Freedom 2015 K | $14,904,337 |
| Fidelity Mutual Funds – Fidelity US Bond Index | $14,379,622 |
| Fidelity Mutual Funds – Fidelity Freedom 2055 K | $13,197,729 |
| *American Funds Mutual Funds – EuroPacific Growth R6* | $12,200,168 |
| Fidelity Mutual Funds – Fidelity International Index | $9,585,988 |
| Fidelity Mutual Funds – Fidelity Freedom 2010 K | $8,037,469 |
| Fidelity Mutual Funds – Fidelity Small Cap Value | $7,817,870 |
| *MFS – Value R6* | $6,386,195 |
| *Vanguard – Inflation-Protected Securities Admiral* | $4,847,366 |
| *Carillon Eagle Mutual Funds – Small Cap Growth R6* | $3,785,341 |
| *DFA Mutual Funds – Emerging Markets Core Equity Portfolio Inst'l* | $3,585,014 |

| | |
|---|---|
| Fidelity Mutual Funds – Fidelity Freedom 2060 K | $2,976,754 |
| ***The Hartford Mutual Funds – World Bond R6*** | $2,468,749 |
| Fidelity Mutual Funds – Fidelity Freedom 2005 K | $,1874,770 |
| Fidelity Mutual Funds – Fidelity Freedom Income K | $1,829,225 |
| Fidelity Mutual Funds – Fidelity Freedom 2065 K | $1,198 |

72.     As of December 31, 2020, the following options were available to Plan participants who selected TIAA (non-TIAA funds are bolded and italicized):

| Fund Name | Total Assets |
|---|---|
| TIAA Investment Contract – Traditional Non Benefit Responsive | $339,449,598 |
| CREF Variable Annuity – Stock Account R2 | $217,159,383 |
| TIAA Investment Contract – Traditional Benefit Responsive | $70,969,696 |
| CREF Variable Annuity – Growth Account R2 | $62,550,364 |
| TIAA-CREF Mutual Funds – Equity Index Institutional | $58,592,800 |
| CREF Variable Annuity – Social Choice Account R2 | $38,232,634 |
| CREF Variable Annuity – Global Equities Account R2 | $36,540,721 |
| TIAA Pooled Separate Account – Real Estate Account | $35,954,826 |
| TIAA-CREF Mutual Funds – Lifecycle 2040 Institutional | $31,697,513 |
| TIAA-CREF Mutual Funds – Lifecycle 2035 Institutional | $28,523,616 |
| TIAA-CREF Mutual Funds – Lifecycle 2025 Institutional | $24,006,944 |
| CREF Variable Annuity – Bond Market Account R2 | $23,202,412 |
| TIAA-CREF Mutual Funds – Lifecycle 2030 Institutional | $22,212,920 |
| TIAA-CREF Mutual Funds – Lifecycle 2020 Institutional | $21,822,238 |
| TIAA-CREF Mutual Funds – Lifecycle 2045 Institutional | $19,200,665 |
| TIAA-CREF Mutual Funds – International Equity Index Institutional | $18,847,490 |
| TIAA-CREF Mutual Funds – Lifecycle 2010 Institutional | $14,954,191 |
| CREF Variable Annuity – Money Market Account R2 | $14,275,916 |

| | |
|---|---|
| TIAA-CREF Mutual Funds –Bond Index Institutional | $13,448,693 |
| CREF Variable Annuity – Equity Index Account R2 | $13,242,714 |
| TIAA-CREF Mutual Funds – Lifecycle 2050 Institutional | $12,238,690 |
| CREF Variable Annuity – Inflation-Linked Bond Account R2 | $12,062,522 |
| ***MFS – Value Fund Class R6***[14] | $10,826,470 |
| ***Vanguard – Federal Money Market Investor*** | $9,112,081 |
| TIAA-CREF Mutual Funds – Mid-Cap Value Institutional | $9,824,364 |
| TIAA-CREF Mutual Funds – Lifecycle 2015 Institutional | $9,722,023 |
| ***American Funds Mutual Funds – EuroPacific Growth R6*** | $9,452,392 |
| ***Goldman Sachs Mutual Funds – Small Cap Value Institutional*** | $7,062,079 |
| ***DFA Mutual Funds – Emerging Markets Core Equity Portfolio Inst'l*** | $6,692,161 |
| TIAA-CREF Mutual Funds – Lifecycle 2055 Institutional | $5,643,440 |
| ***The Hartford Mutual Funds – Mid Cap Fund R6*** | $4,568,326 |
| ***The Hartford Mutual Funds – World Bond R6*** | $3,169,451 |
| ***Carillon Eagle Mutual Funds – Small Cap Growth R6*** | $3,091,829 |
| TIAA-CREF Mutual Funds – Lifecycle 2060 Institutional | $651,094 |
| TIAA-CREF Mutual Funds – Large-Cap Value Institutional | $1 |

73.    A participant who enrolls in a plan but does not specify an investment allocation will have contributions invested in the plan's "qualified default investment alternative" ("QDIA"), selected by the plan's fiduciaries operating under DOL guidelines. The Plan's applicable QDIA is one of the age-based funds (the TIAA Lifecycle or Fidelity Freedom funds), depending on which custodian the participant selects. *See* SPD at 5; Report, *supra* n.8, at 2.

---

[14] Six funds—MFS Value, Vanguard Federal Money Market, American EuroPacific Growth, The Hartford World Bond, Carillon Eagle Small Cap Growth, and DFA Emerging Markets Core Equity Portfolio—appear to be offered under each custodian and are listed twice on the Plan's Form 5500. Each custodian also offers a brokerage window, *see supra* n.9. Just over $690,000 is invested in TIAA's brokerage window, while over $79 million is invested in Fidelity's.

74.    The Plan has included investment options with unreasonably high expense ratios. For example, the TIAA Real Estate Account has been included throughout the Class Period. And as shown above, the Real Estate account is the 8th largest holding administered by TIAA. *See supra* ¶ 72. Participants invested in the Real Estate Account appear to pay a 0.77% expense ratio for the privilege of investing in it.[15] And as courts have noted in other cases involving the Real Estate Account, *see infra* ¶ 79, the account is structured in a way that inevitably leads to higher expenses. The result is that, while typical real estate funds available to retirement plan participants average expense ratios of 0.59% to 0.64%,[16] the Plan's participants are paying up to a third more.

75.    As with recordkeeping expenses, plan fiduciaries should evaluate investment fees by obtaining detailed pricing information and comparing existing investment options in the relevant Plan to potential alternatives. Again, larger plans generally qualify for lower fees. The effect is pronounced compared to recordkeeping fees, because mutual funds offer lower-fee share classes to investors that satisfy a threshold amount invested. Indeed, the Plan appears to qualify for lower-fee share classes for many of the Fidelity options it offers. *See infra* ¶ 89 (outlining alternatives). In addition, the same investments may be available through lower-cost vehicles such as Separate Accounts.

76.    Here, the available facts indicate Defendants did not engage in a prudent monitoring process. Indeed, throughout the class period, it appears no options in the Plan saw a change in share classes, and only three (the Templeton Global Fund, TIAA-CREF Large Value Institutional, and TIAA-CREF Mid-Cap Growth Institutional) were removed and replaced. That

---

[15] *See* TIAA, *Real Estate Account*, https://www.tiaa.org/public/retire/financial-products/annuities/retirement-plan-annuities/tiaa-real-estate-account (last visited June 27, 2022). The quarterly investment update for the Plan does not list fee information for the Real Estate Account.

[16] *See* ICI Report, *supra* n.6 at 54, 34 (reporting average expense ratios for funds in "other" category, which includes real estate funds).

is three out of sixty-six total options, many of which have multiple red flags. Defendants' lack of prudence cost participants dearly.

**B.     Defendants Ignored Public Red Flags About TIAA and Fidelity Contrary to Participants' Interests**

77.     While the foregoing examples of failed oversight—subjecting participants to costly services and investments—arise in other cases challenging ERISA fiduciary breaches, the facts here even more clearly indicate Defendants breached their duties because they ignored multiple red flags about TIAA and Fidelity, including court decisions concluding that specific investments in the Plan were imprudent.

**(1) TIAA and "Fear Selling"**

78.     Participants in many university-sponsored plans throughout the country have raised red flags about TIAA's offerings. TIAA has essentially exploited its first-mover advantage and its market clout in the higher-education field, and taken advantage of plan fiduciaries' neglect, to saddle plans with underperforming, costly funds.

79.     In 2019, the Third Circuit held a complaint plausibly alleged that the fiduciaries of the University of Pennsylvania's retirement plans breached their fiduciary duties in part because their plan offered the TIAA Real Estate Account and the CREF Stock Account. *See Sweda*, 923 F.3d at 331. A year before, a Court within the First Circuit—the District of Rhode Island—similarly concluded that participants in Brown University's retirement plan stated a claim based on the underperformance and costly nature of the TIAA Real Estate Account and the CREF Stock Account. *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 372 (D.R.I. 2018). Nevertheless, both options remain in the Plan and have been retained throughout the Class Period.

80.     Even more troublingly, a joint investigation by the Securities and Exchange Commission and New York's Attorney General brought to light disturbing information about a TIAA subsidiary's marketing practices. That subsidiary had a years-long record of taking advantage of TIAA's privileged access to retirement plan participants to, essentially, scare them

into buying services they didn't need. The NYAG's findings lay out the practice:

"Beginning in or about 2012, TIAA Services and its salespeople used a false and misleading marketing pitch to convince investors to roll over assets from low-fee employer-sponsored retirement plans to individual managed accounts in TIAA Services' Portfolio Advisor program, on which TIAA Services charged lucrative management fees."

*In re Investigation by Letitia James of TIAA-CREF Individual & Institutional Services, LLC*, Assurance of Discontinuance at 1, 21-035 (July 13, 2021).

81.     TIAA's subsidiary trained and incentivized salespeople "to identify clients' 'pain points.'" (*i.e.,* their concerns about their retirement readiness) and sell them managed services, which earned the company more money. *Id.* at 2, 4.

82.     As the investigation noted, the practice grew out of TIAA's realization a decade ago, that its business line of administering employer-sponsored plans (like the Plan) was in trouble, in part due to demographic trends and in part due to the competitive nature of the retirement plan marketplace, described above. *Id.* at 2-3. TIAA's subsidiary leveraged two key assets enjoyed by its parent—access to retirement plan participants and "the trust of its clients." *Id.* at 3.

83.     TIAA's subsidiary specifically targeted participants in TIAA-administered retirement plans, and used the "false and misleading" marketing tactics the New York Attorney General described:

"The first step of the Sales Process was for Advisors to cold-call preselected participants in TIAA-administered employer-sponsored retirement plans to offer free financial planning services. These services were often described as included in, or a benefit of, the investor's retirement plan. If an investor accepted the offer, Advisors held a "discovery" meeting with the client to gather information about the client's finances, goals, and risk profile.

TIAA Services trained Advisors to use the discovery meeting to uncover "pain points" that could be used to help motivate an investor to make changes to their

financial portfolio. Under the Sales Process, Advisors were coached to frame the
discussion around four financial planning challenges – asset management and
allocation, income distribution, incapacity, and estate planning – and to get the
client to "self-realize" that they needed help in one or more of these areas. Some
Advisors expressed discomfort with this approach, describing it as a form of 'fear
selling.'"

*Id.* at 4.

84.     The Attorney General issued her findings in July 2021, but the investigation and
underlying allegations were public knowledge as early as November 2017. Indeed, a New York
Times article detailing the investigation made clear: a) the nature of TIAA's marketing; b) the
equally troubling practice of targeting participants in retirement plans contracting with TIAA;
and, c) the fact that this had been going on for years by that point. *See* Gretchen Morgenson,
*TIAA Receives New York Subpoena on Sales Practices* (N.Y. Times Nov. 9, 2017), *available at*
https://www.nytimes.com/2017/11/09/business/tiaa-subpoena.html ("Most of TIAA's clients
invest with the firm because their employers have hired it to administer their workers' retirement
plans. TIAA typically acts as record keeper to these institutions, administering accounts that
allow plan participants to choose among an array of mutual funds and annuities."); *id.*
(describing 2012 training materials titled "The Probing Sequence, Making the Client 'Feel the
Pain.'").

85.     In the face of all of this, Defendants did—nothing. TIAA was and remains one of
the Plan's custodians—enjoying access to information about the Plan's thousands of participants.
Defendants have not removed the TIAA Real Estate Account or the CREF Stock Account from
the Plan's investment lineup. Nor have they, to Plaintiff's knowledge, warned participants about
TIAA's marketing practices at any point in the Class Period.

**(2) <u>Fidelity and Its Costly Offerings</u>**

86.     The red flags associated with Fidelity were less headline-grabbing but were also harmful to the Plan's participants and equally demanding of Defendants' attention. That attention likewise never came.

87.     As with TIAA, a 2017 court opinion provided strong notice to the Plan's fiduciaries to scrutinize Fidelity closely. In *Tracey v. Massachusetts Inst. of Technology*, No. CV 16-11620-NMG, 2017 WL 4478239 (D. Mass. Oct. 4, 2017), the District of Massachusetts allowed a suit challenging Fidelity's investment and recordkeeping fees to proceed. Two years later, the Court refused to grant the defendants summary judgment on the question of whether those defendants were imprudent in keeping several Fidelity investment options, including its target date funds. *Tracey v. Mass. Inst. of Tech.*, 404 F. Supp. 3d 356, 362 (D. Mass. 2019).

88.     The MIT case is no outlier. Fidelity's costly offerings and recordkeeping services have been challenged by participants in numerous plans, including in those offered to Fidelity's own employees. *See Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 218-19 (D. Mass. 2020) (noting stipulated facts that "recordkeeping services would have been available to the Plan for a significantly lower cost per head" than that charged by Fidelity and concluding fiduciaries were negligent in failing to monitor the costs).

89.     Compounding these issues, Defendants failed to move the Plan into less expensive versions of options already in the Plan. The Plan was invested in the "K" share class for different Fidelity options, including the Fidelity Freedom Target Date Funds—the very funds identified in the 2021faculty report. *See supra* ¶¶ 67-70. As Fidelity's own materials show, the Plan qualified for K6 shares. Defendants' failure to make these funds available resulted in participants paying expense ratios over 30% higher in some instances:

| Fund | Expense Ratio – *K Class (In the Plan)* | Expense Ratio – K6 Class |
|---|---|---|
| Fidelity Freedom 2005 | 0.42 | 0.37 |
| Fidelity Freedom 2010 | 0.44 | 0.38 |
| Fidelity Freedom 2015 | 0.48 | 0.40 |
| Fidelity Freedom 2020 | 0.51 | 0.42 |
| Fidelity Freedom 2025 | 0.55 | 0.44 |
| Fidelity Freedom 2030 | 0.58 | 0.46 |
| Fidelity Freedom 2035 | 0.62 | 0.48 |
| Fidelity Freedom 2040 | 0.65 | 0.50 |
| Fidelity Freedom 2045 | 0.65 | 0.50 |
| Fidelity Freedom 2050 | 0.65 | 0.50 |
| Fidelity Freedom 2055 | 0.65 | 0.50 |
| Fidelity Freedom 2060 | 0.65 | 0.50 |
| Fidelity Freedom 2065 | 0.65 | 0.50 |

*See* Fidelity Pricing Options for Retirement Plans, As of April 30, 2022 at 5, *available at* https://institutional.fidelity.com/app/proxy/content?literatureURL=/9861765.PDF.[17]

90.     As with TIAA, despite this record replete with red flags about Fidelity, Defendants failed to take action to ensure Plan participants were not overcharged and underserved.

**C.     Defendants' Failure to Take Action with Respect to TIAA and Fidelity Is Not Justified by Their Underperforming Investment Offerings**

91.     Defendants' failure to replace TIAA, Fidelity, and/or their investment offerings finds no justification in those investments' performance. Indeed, the CREF Stock Account

---

[17] Defendants' imprudence is clear even from this comparison based on public pricing information, but it bears emphasizing that the Plan's superior bargaining power based on its asset size and participant count, should open the door to even lower rates.

(flagged in prior litigation) continued to underperform lower-cost funds in the same category that measured their performance against the same benchmark index.

92.     As the plaintiffs in the litigation involving Brown University pointed out, the CREF Stock Account underperformed in comparison to the following actively managed, large-cap funds with similar underlying asset allocations: The Vanguard Diversified Equity Fund (Investor Class) (VDEQX), the Vanguard PRIMECAP Fund (Admiral) (VPMAX), and the Vanguard Capital Opportunity Fund (Admiral) (VHCAX)." Compl. ¶ 70, *Short v. Brown Univ.*, No. 17-cv-00318-M-PAS (D.R.I. July 6, 2017). Unsurprisingly, the CREF Stock Account has continued to underperform *all* of these alternatives, for the critical 3- and 5-year periods, in some cases, it has underperformed by over a third:

|  | 5-Year Performance | 3-Year Performance | 1-Year Performance |
|---|---|---|---|
| *CREF Stock Account (In Plan)* | 9.67% | 9.52% | -7.15% |
| **Vanguard Diversified Equity** | 13.22% | 13.01% | -8.84% |
| **Vanguard PRIMECAP** | 13.25% | 11.93% | -5.03% |
| **Vanguard Capital Opp.** | 12.79% | 11.71% | -7.71% |

93.     As detailed in the chart above, each of the comparator funds the Brown University Plan participants identified outperformed the CREF Stock Account dramatically over the 3- and 5-year periods, with the CREF Stock Account edging out two for the volatile, trailing 12-months. All of these times are within the Class Period. And the CREF Stock account had been underperforming for years even before the *Brown* plaintiffs filed. Prudent fiduciaries would have investigated and sought out better performing, lower-cost alternatives to the CREF Stock Account either from among those *specifically* identified in public litigation or from the myriad alternatives available in the marketplace. That Defendants failed to do so shows they failed to implement a prudent process for monitoring the Plan's investment options.

94.     The options listed in the above chart are simply examples of the superior options available in the marketplace.

95.     Given the CREF Stock Account's clear and continuing underperformance, and given the substantial red flags associated with TIAA in general, the Plan's fiduciaries should have replaced it during the Class Period.

96.     Defendants' failure to take action had a profound impact on Plan participants. The CREF Stock Account is the second-largest investment in the Plan, under either custodian, after the TIAA Traditional Annuity. *See supra* ¶¶ 71-72. Nearly an eighth of the Plan's total assets are invested in the CREF Stock Account. If any investment option merited close scrutiny, this was it.

97.     Had Defendants prudently monitored the investments within the Plan, Defendants would have removed the CREF Stock Account and other funds in favor of superior funds featuring comparable investment objectives, superior performance, and charging lower fees. Certainly, the performance of the CREF Stock Account and other TIAA or Fidelity offerings did not provide Defendants a justification for maintaining the Plan's relationships with TIAA and Fidelity in the face of the numerous red flags outlined above.

## CLASS ACTION ALLEGATIONS

98.     Plaintiff brings causes of action as a class action on behalf of himself and all others similarly situated. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) allows participants to bring actions on behalf of a plan. Plaintiff seeks certification pursuant to that provision and pursuant to Federal Rule of Civil Procedure 23(a) and (b). The putative Class that Plaintiff seeks to represent is defined as follows:

> All persons, except Defendants and their immediate family members, who were participants in, or beneficiaries of the Plan, at any time between June 30, 2016 through the date of judgment (the "Class Period").[18]

---

[18] Plaintiff reserves the right to propose different or additional classes or subclasses in their motion for class certification or subsequent pleadings.

99.    <u>Numerosity</u>: The Members of the putative Class are so numerous that joinder of all Members is impractical. As of December 31, 2020, the Plan had 8,335 "participants with account balances as of the end of the plan year" 2020 Form 5500 at 2. To require individual actions would prejudice putative Class Members and Defendants. The identities of the putative Class Members, and the details of their retirement plan accounts, will be determined from Defendants' records.

100.    <u>Typicality</u>: Plaintiff's claims are typical of those of other Members of the putative Class. Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement, like other Class Members. Defendants treated Plaintiff and other Class Members consistently and managed the Plan uniformly as to all Participants. Plaintiff's claims arise out of the same conduct and misconduct by Defendants, as alleged herein, that form the basis of Class Members' claims. Defendants' wrongful conduct has affected all Members of the Class similarly. Plaintiff's claims are thereby representative of and co-extensive with the claims of the Class.

101.    <u>Commonality</u>: There are questions of law and fact common to Plaintiff and putative Class Members that predominate over any questions affecting only individual Members of the putative Class. These common questions of law and fact include, but are not limited to:

a)  Whether Defendants are and/or were fiduciaries of the Plan.

b)  Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

c)  Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

d)  The proper form of equitable and injunctive relief; and

e)  The proper measure of monetary relief.

102.    <u>Adequacy of Representation</u>: Plaintiff has no conflicts of interest with other Class Members, will fairly and adequately represent the Class, and will prosecute the case vigorously

on behalf of the Class. Counsel representing Plaintiff are competent and experienced in litigating complex cases and large class actions, including ERISA and other employment law cases.

103.   Superiority of Class Action:  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the Members of the putative Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the Members of the Class would create a risk of adjudications with respect to individual Members of the Class that, as a practical matter, would be dispositive of the interests of other Members not parties to this action, or that would substantially impair or impede their ability to protect their interests. An award of equitable relief, such as removal of fiduciaries would apply to all participants in the Plan and would thus be dispositive of their interests.

104.   In the alternative, certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

105.   Finally, certification is warranted under Rule 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' misconduct applied uniformly to all Class Members, who individually do not have an interest in pursuing separate actions. The amount of each individual's recovery is relatively small compared to the burden of individual prosecution. Certification will also obviate the need for duplicative litigation that might render inconsistent judgment, and management of this action as a class action will not present likely difficulties.

106.   If each individual Member of the putative Class were required to file an individual lawsuit, Defendants would necessarily gain an unfair advantage because Defendant would be able to exploit and overwhelm the limited resources of each Class Member with Defendants' vastly superior financial legal resources.

107.    Requiring each individual Member of the putative Class to pursue an individual remedy would also discourage the assertion of lawful claims by those Class Members, particularly by those still employed by Northeastern, who would be disinclined to pursue these claims against Defendant because of an appreciable and justifiable fear of retaliation and permanent damage to their careers and well-being.

## FIRST CAUSE OF ACTION

**Breach of Fiduciary Duty of Prudence in Violation of ERISA (29 U.S.C. § 1104(a)(1)(B))**

108.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

109.    As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

110.    ERISA Section 404, 29 U.S.C. § 1104, imposes fiduciary duties of prudence upon the Defendants in connection with the administration of the Plan, the selection and monitoring of Plan investments, and the monitoring of service providers to the Plan.

111.    Defendants' fiduciary responsibilities include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with appropriate care, skill, diligence, and prudence. Defendants are also required to act in accordance with the documents and instruments governing the plan insofar as they are consistent with ERISA. Finally, Defendants are obligated to ensure that the Plan's fees are reasonable, to select and retain prudent investment options, evaluate and monitor the Plan's investments on an ongoing basis and eliminate imprudent ones, and take all necessary steps to ensure that the Plan's assets are invested prudently. This duty includes "a continuing duty . . . to monitor investments and remove imprudent ones[.]" *Hughes*, 142 S. Ct. at 741; *Tibble*, 575 U.S. at 529.

112.    As detailed above, Defendants failed to prudently and objectively monitor the Plan's investments to ensure that each of the investments was and remained appropriate for the

Plan. Defendants failed to remove those investments that were no longer appropriate. Defendants retained imprudent funds as Plan investments despite the availability of superior alternative investments that would have cost Plan participants significantly less and performed significantly better. Defendants failed to remove TIAA and Fidelity funds, and to investigate alternatives to them as recordkeepers, despite multiple, public red flags associated with each company.

113.    Each of the actions and omissions described in Paragraph 112 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

114.    Defendants' conduct likely also constitutes a breach of their duty to act in accordance with the documents and instruments governing the plan, in violation of ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

115.    The Plan and its participants suffered millions of dollars in losses as a consequence of Defendants' fiduciary breaches.

116.    Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendants made through use of Plan assets, and to restore to the Plan any profits resulting from their breaches of fiduciary duties.

117.    Each Defendant knowingly participated in each breach of the other Defendants, with knowledge that such acts were a breach, and enabled other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties. Each Defendant knew of the other Defendants' breaches and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Under ERISA Section 405, 29 U.S.C. § 1105(a), each Defendant is therefore also liable for the losses caused by the breaches of their co-fiduciaries.

118.    Wherefore, Plaintiff and Members of the putative Class request relief as hereinafter provided.

## SECOND CAUSE OF ACTION

**Failure to Monitor Fiduciaries**

119.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

120.    Defendant Northeastern University is a fiduciary of the Plan with responsibilities relating to the selection and monitoring of Plan investment options.

121.    Northeastern is responsible for appointing and removing members of the 403(b) Investment Committee. Northeastern therefore has a fiduciary responsibility to monitor the performance of the Committee and its members.

122.    ERISA requires monitoring fiduciaries to ensure that the fiduciaries they monitor in turn satisfy their fiduciary obligations. These obligations include those with respect to investment selections, monitoring of service providers, and compliance with plan documents. Monitoring fiduciaries are required to act promptly to protect plans, participants, and beneficiaries when monitored fiduciaries breach their own obligations.

123.    Northeastern breached its fiduciary monitoring duties in numerous ways, including:

> a)  failing to monitor and evaluate the performance of the 403(b) Investment Committee and failing to have a system in place for doing so. Northeastern did nothing as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;
>
> b)  failing to monitor the processes by which those responsible selected and monitored Plan investments. The monitored fiduciaries' actions and inactions would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above; and

c) failing to remove 403(b) Investment Committee members whose performance was inadequate as demonstrated by their retaining imprudent, excessively costly, and poorly performing investments within the Plan to the detriment of the Plan and Plan participants' retirement savings.

124.    Due to these foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to excessive fees and investment underperformance.

125.    ERISA Sections 409 and 502, 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), render Northeastern liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor its appointed fiduciaries on the Investment Committee.

126.    Wherefore, Plaintiff and putative Class Members request relief as hereinafter provided.

## **PRAYER**

127.    For these reasons, Plaintiff and Class Members respectfully request that judgment be entered in their favor awarding the following relief:

a) A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

b) Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

c) A Declaration that the Defendants have breached their fiduciary duties under ERISA;

d) An Order compelling the Defendants to personally make good to the Plan all losses to the Plan incurred as a result of Defendants' breaches of their fiduciary duties described above and to restore the Plan and its participants to the position they would have been in but for this unlawful conduct;

e) An order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

f) Restoration of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

g) An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

h) Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan, transfer of Plan assets out of imprudent investments into prudent alternatives, and removal of fiduciaries deemed to have breached their fiduciary duties;

i) An award of pre-judgment interest;

j) An award of attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine; and

k) An award of such other and further relief as the Court deems equitable and just.


Dated: June 30, 2022                        Respectfully submitted,


                                            */s/  Stephen Churchill*
                                            Stephen Churchill, BBO #564158
                                            Osvaldo Vazquez, Fl. Bar #0070995; Mass. Bar
                                            Application Pending
                                            FAIR WORK, P.C.
                                            192 South Street, Suite 450
                                            Boston, MA 02111
                                            Tel. (617) 607-3260

Fax. (617) 488-2261
steve@fairworklaw.com
oz@fairworklaw.com

*Attorneys for Plaintiff and Class Members*