2023 WL 5731996
Only the Westlaw citation is currently available.
United States Court of Appeals, Tenth Circuit.

Cole MATNEY and Paul Watts, individually and on behalf of others similarly situated, Plaintiffs-Appellants,

v.

BARRICK GOLD OF NORTH AMERICA; Board of Directors of Barrick Gold of

North America; Barrick U.S. Subsidiaries Benefits Committee, Defendants - Appellees.

The Chamber of Commerce of the United States of America; The Erisa Industry Committee; The National

Mining Assocation; The American Benefits Council; Investment Company Institute, Amici Curiae.

No. 22-4045
|
FILED September 6, 2023

**Synopsis**

**Background:** Participants in employer-sponsored defined-contribution retirement plan brought putative class action under ERISA against employer, its board of directors, and its benefits committee, alleging that committee breached the duty of prudence by offering high-cost funds and incurring high recordkeeping fees and that employer and board of directors breached their duty to monitor fiduciaries by failing to oversee committee's actions. The United States District Court for the District of Utah, Tena Campbell, J., 2022 WL 1186532, granted defendants' motion to dismiss for failure to state a claim and then denied participants' post-judgment motion to alter or amend the judgment. Participants appealed.

**Holdings:** The Court of Appeals, Rossman, Circuit Judge, held that:

as a matter of first impression, a claim for breach of ERISA's duty of prudence can be based on allegations that the fees associated with a defined-contribution plan are too high compared to available, cheaper options, but to raise an inference of imprudence through price disparity, a plaintiff has the burden to allege a meaningful benchmark;

absent allegations about suitable benchmark funds, participants did not state a claim for breach of the duty of prudence based on allegation that plan offered high-cost funds;

certain documents attached to defendants' motion to dismiss were properly considered by the district court;

allegations that plan did not solicit competitive bids for recordkeeping services did not state a claim for breach of the duty of prudence;

absent allegations about recordkeeping fees of suitable benchmark plans, participants did not state a claim for breach of the duty of prudence based on allegation that plan incurred excessive recordkeeping fees;

claim for breach of the duty to monitor failed in the absence of any viable claim for breach of the duty of prudence; and

appellate court lacked jurisdiction to consider participants' challenge to district court's denial of their post-judgment motion to amend because participants failed to appeal the denial.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim; Motion to Alter or Amend Judgment.

**Appeal from the United States District Court for the District of Utah (D.C. No. 2:20-CV-00275-TC-CMR)**

**Attorneys and Law Firms**

Mark K. Gyandoh, Cappozi Adler, P.C., Harrisburg, Pennsylvania (Donald R. Reavey and Gabrielle Kelerchian, Cappozi Adler, P.C., Harrisburg, Pennsylvania; David K. Isom, Isom Law Firm, PLLC, Salt Lake City, Utah with him on the brief), for Appellants.

Sanford I. Weisburst, Quinn Emanual Urquhart & Sullivan, LLP, New York, New York (Kaitlin P. Sheehan, Alexander W. Resar, Quinn Emanual Urquhart & Sullivan, LLP, New York, New York; Stephen Q. Wood, Quinn Emanuel Urquhart & Sullivan, LLP, Salt Lake City, Utah with him on the brief), for Appellees.

Paul Lettow, U.S. Chamber Litigation Center, Washington, DC; Jaime A. Santos, Goodwin Procter LLP, Washington DC; Jordan Bock, Goodwin Procter LLP, Boston, Massachusetts; filed a brief on behalf of Appellees, for Amici Curiae Chamber of Commerce of the United States of America, The American Benefits Council, The ERISA Industry Committee, and The National Mining Association.

Elena Barone Chism, Investment Company Institute, Washington, DC; Amy D. Roy, Robert A. Skinner, Daniel V. Ward, Kelly M. DiSantis, Ropes & Gray LLP, Boston, Massachusetts; Douglas Hallward-Driemeier, Ropes & Gray LLP, Washington, DC; Joshua A. Lichtenstein, Phillip G. Kraft, Ropes & Gray LLP, New York, New York, filed a brief on behalf of Appellees, for Amicus Curiae Investment Company Institute.

Before TYMKOVICH, MORITZ, and ROSSMAN, Circuit Judges.

**Opinion**

ROSSMAN, Circuit Judge.

*\*1* Appellants Cole Matney and Paul Watts (together, Mr. Matney) participated in an employer-sponsored retirement plan (the Plan). They brought this putative class action against Appellees—Barrick Gold of North America, Inc. (Barrick Gold), Barrick Gold's Board of Directors (Board), and the Barrick U.S. Subsidiaries Benefits Committee (Committee)—for breach of fiduciary duty and failure to monitor fiduciaries under §§ 409 and 502 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1109, 1132. Mr. Matney alleged the Committee breached the fiduciary duty of prudence by offering high-cost funds and charging high fees. He claimed Barrick Gold and the Board were responsible for failing to monitor the Committee's actions. The district court dismissed the case with prejudice, concluding the first amended complaint did not plausibly allege any breach of fiduciary duty under ERISA. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

**A**

Barrick Gold is a company with "gold and copper mining operations and projects in 13 countries."[1] App. at 103 (citation omitted). The company sponsors a defined-contribution benefits plan "to enable eligible Employees to save for retirement." *Id*. at 105 (citation omitted). In a defined-contribution plan, the employer provides "an individual account for each participant," 29 U.S.C. § 1002(34), to which both the employer and employee can contribute, and the employee is entitled to the assets in the account. *See Tibble* v. *Edison Int'l*, 575 U.S. 523, 528-30, 135 S.Ct. 1823, 191 L.Ed.2d 795 (2015) (explaining what is required for fiduciaries of defined-contribution plans under ERISA to uphold their duty of prudence). The value of an employee's

individual account "is largely a function of the amounts contributed to that account and the investment performance of those contributions." *LaRue* v. *DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 250 n.1, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008). Thus, "in a defined-contribution plan, such as a 401(k) plan, ... the benefits can turn on the plan fiduciaries' particular investment decisions." [2] *Thole* v. *U.S. Bank N.A.*, ––– U.S. ––––, 140 S. Ct. 1615, 1618, 207 L.Ed.2d 85 (2020). Though "[e]ach participant chooses how to invest her funds ... [s]he may choose only from the menu of options selected by the plan administrators." *Hughes* v. *Nw. Univ.*, ––– U.S. ––––, 142 S. Ct. 737, 740, 211 L.Ed.2d 558 (2022). "Defined contribution plans dominate the retirement plan scene today." *LaRue*, 552 U.S. at 255, 128 S.Ct. 1020.

[1]   Because the appeal before us concerns a motion to dismiss, we take these facts from Mr. Matney's first amended complaint (FAC). *See, e.g.*, *Moffett* v. *Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1230–31 (10th Cir. 2002) (relying on facts in the complaint to describe the background when appeal involves challenge to a district court's order granting a motion to dismiss).

[2]   By contrast, "[i]n a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole*, 140 S. Ct. at 1618.

**\*2** Consistent with these principles, Barrick Gold's plan offered "employees a collection of retirement investment options," App. at 543, and allowed them to "direct all contributions to selected investments as made available," *id.* at 107. At all times relevant here, "the Plan had at least half a billion dollars in assets under management.... qualif[ying] it as a large plan in the defined contribution plan marketplace." *Id.* at 100.

Two types of investments offered by the Plan are relevant here: mutual funds and collective trusts. "A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund." *Jones* v. *Harris Assocs. L.P.*, 559 U.S. 335, 338, 130 S.Ct. 1418, 176 L.Ed.2d 265 (2010) (alterations in original) (citation omitted). Collective trusts (CITs) "are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash." App. at 121. CITs are "[r]egulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission," which means they "have simple disclosure requirements, and cannot advertise nor issue formal prospectuses." *Id.*

Barrick Gold appointed the Committee as the Plan administrator and fiduciary, as required under ERISA. 29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."). The Plan specified the Committee's responsibilities, which included " 'selecting and monitoring the performance of the trustees, record keepers and/or investment managers and advisors; ... selecting investment options with respect to the Plans that permit participants to direct their own investments; periodically evaluating the Plan's investment performance and recommending investment and investment option changes.' " App. at 104-05 (quoting Supp. App. at 380). The Committee enlisted Fidelity Management Trust Company (Fidelity) to provide the recordkeeping services for the Plan.

### B

Mr. Matney sued Appellees in federal district court in Utah on behalf of himself and others similarly situated under §§ 409 and 502 of ERISA. 29 U.S.C. §§ 1109, 1132. Mr. Matney alleged two causes of action: (1) breach of the fiduciary duties of loyalty and prudence by the Committee, and (2) breach of fiduciary duty by Barrick Gold and the Board for failing to monitor the Committee's actions.

The complaint primarily focused on the breach of the fiduciary duty of prudence by the Committee. Mr. Matney claimed the Plan charged too-high investment management fees and recordkeeping fees, thus raising the inference that the Committee failed to prudently operate and administer the Plan. "Investment-management fees ... compensate a fund, such as a mutual fund or

index fund, for designing and maintaining the fund's investment portfolio." *Albert* v. *Oshkosh Corp.*, 47 F.4th 570, 574 (7th Cir. 2022). "These fees are usually calculated as a percentage of the assets the plan participant chooses to invest in the fund, which is known as the expense ratio." *Hughes*, 142 S. Ct. at 740. Recordkeeping fees, unlike management fees, pay for services such as "track[ing] the balances of individual accounts, provid[ing] regular account statements, and offer[ing] informational and accessibility services to participants." *Id.*

**\*3** To support imprudence by the Committee based on the allegedly higher fees, the complaint compared the costs of the Plan's investment options against comparable alternatives. The complaint also compared the Plan's recordkeeping fees against the average fees charged by smaller plans. These cost comparisons alleged the Plan offered more expensive investment options and charged higher fees when cheaper alternatives were available. According to Mr. Matney, the disparity in fees raised a reasonable inference that the Committee breached its fiduciary duty of prudence to plan participants in violation of ERISA. The complaint sought damages for "any losses the Plan suffered," "[a]n order enjoining [Appellees] from any further violations of their ERISA fiduciary responsibilities," and other equitable relief. App. at 139.

Appellees moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). As relevant here, Appellees contended the complaint failed to state a plausible claim for breach of the duty of prudence. According to Appellees, the claim of imprudence improperly relied on flawed cost comparisons and conclusory allegations that the Plan's funds were more expensive than allegedly cheaper alternative options. As to the claim of imprudence based on recordkeeping fees, Appellees argued there was no "fiduciary duty to obtain competitive bids for recordkeeping services," App. at 167, and in any event, the FAC made "apples to oranges comparisons" of recordkeeping services without ever alleging "what a reasonable fee in this case would be," *id.* at 169. Finally, Appellees contended the duty to monitor claim against Barrick Gold and the Board should be dismissed because it was derivative, meaning its success depended on the viability of the breach of fiduciary duty claims against the Committee.

Mr. Matney opposed dismissal. He argued the complaint "allege[d] circumstantial facts from which the Court [could] reasonably infer that Defendants' investment selection and monitoring processes were imprudent." *Id.* at 188. According to Mr. Matney, Appellees based certain of their arguments for dismissal on documents referenced in the complaint, which he claimed was improper at the motion to dismiss stage. *Id.* at 196. The district court held a hearing on the motion on May 27, 2021.[3]

[3] In December 2021, the parties jointly requested a stay pending the outcome of *Hughes*, 142 S. Ct. at 737. According to the parties, the question presented in *Hughes*—"[w]hether allegations that a defined-contribution retirement plan paid or charged its participants fees that substantially exceeded fees for alternative available investment products or services are sufficient to state a claim against plan fiduciaries for breach of the duty of prudence under ERISA"—might "impact the issues presented in this case as well as the scope of discovery." App. at 516 (citation omitted).
The district court granted the stay and, after the Supreme Court decided *Hughes* in January 2022, ordered "the parties to weigh in on [its] effect, if any," on the motion to dismiss, *id.* at 521-22. Both parties submitted supplemental briefs. Mr. Matney argued *Hughes* supported denying the motion to dismiss because it held, consistent with his allegations, fiduciaries must conduct their own evaluation of whether investments are prudent. Appellees urged dismissal, insisting *Hughes* was narrowly decided and reaffirmed that a "context specific" analysis of a fiduciary's actions is required at the motion to dismiss stage. *Id.* at 531-32. The district court considered this supplemental briefing before granting the motion to dismiss.

### C

On April 21, 2022, the district court issued a written order dismissing Mr. Matney's complaint with prejudice. The court concluded Mr. Matney's duty of prudence allegations failed to raise an inference "that a prudent fiduciary in the same circumstances would have acted differently." *Id.* at 558. The court also determined Mr. Matney failed to separately allege facts relevant to the duty of loyalty claim, instead relying only on the allegations about the Committee's alleged imprudence. Last,

the court decided the duty to monitor claim could not proceed because it depended on a plausible allegation of breach of the other fiduciary duties, which the court found lacking.

 *4  On May 19, Mr. Matney moved for reconsideration under Federal Rule of Civil Procedure 59(e). He insisted dismissal with prejudice was a manifest injustice because it prevented him from amending his complaint. He attached a second amended complaint to his Rule 59(e) motion. The following day, he noticed a timely appeal from the April 21 judgment. The district court denied the Rule 59(e) motion on June 21, 2022. Mr. Matney did not amend his notice of appeal.

## II

Mr. Matney raises three primary issues on appeal. First, he challenges the dismissal of his duty of prudence claim, contending the complaint plausibly alleged the Committee's imprudence based on the Plan's higher-cost offerings when cheaper, comparable investment alternatives were available. Second, he argues the district court erroneously dismissed his duty to monitor claim against Barrick Gold and the Board because his allegations are similar to those other courts have found to state a plausible claim. Third, he challenges the denial of his Rule 59(e) motion, insisting the district court should have allowed him to amend his complaint a second time. [4] We consider each argument in turn and affirm.

[4]   Mr. Matney does not appeal the dismissal of his claim for breach of the duty of loyalty. So we do not address it.

### A

"We review de novo a district court's Rule 12(b)(6) dismissal of a complaint for failure to state a claim." *Brokers' Choice of Am., Inc.* v. *NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017). The Supreme Court has held the familiar Rule 12(b)(6) pleading standard applies to breach of fiduciary duty claims under ERISA. See *Fifth Third Bancorp* v. *Dudenhoeffer*, 573 U.S. 409, 425-26, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014); *Hughes*, 142 S. Ct. at 742 (acknowledging the pleading standard from *Twombly* and *Iqbal* governs ERISA duty of prudence claims). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.' " *Brokers' Choice*, 861 F.3d at 1104 (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To satisfy the plausibility standard, "the complaint must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Clinton* v. *Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (citation omitted).

"In reviewing an order granting a motion to dismiss, our role is like the district court's: we accept the well-pleaded facts alleged as true and view them in the light most favorable to the plaintiff ...." *Id.* However, we "need not accept '[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements.' " *Id.* (alterations in original) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). A conclusory allegation is one in which an inference is asserted without "stating underlying facts" or including "any factual enhancement." *Brooks* v. *Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021). We must disregard conclusory allegations and instead "look to the remaining factual allegations to see whether Plaintiffs have stated a plausible claim." *Id.* "[F]actual allegations that contradict ... a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp.* v. *Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997).

### B

Mr. Matney first contends the district court erroneously dismissed his claim that the Committee breached its ERISA-based fiduciary duty of prudence.[5] According to Mr. Matney, the complaint plausibly alleged an imprudent process based on how

the Committee managed two types of Plan fees: investment management fees and recordkeeping fees. Recall, investment management fees "compensate a fund for designing and maintaining the fund's investment portfolio." *Hughes*, 142 S. Ct. at 740. Recordkeeping fees pay for services such as "track[ing] the balances of individual accounts, provid[ing] regular account statements, and offer[ing] informational and accessibility services to participants." *Id.*

5    The Committee's fiduciary status for purposes of ERISA is not in dispute.

**\*5**  Mr. Matney maintains he plausibly alleged the Plan offered funds that carried higher investment management fees than otherwise identical alternative funds and paid excessive recordkeeping fees, leaving the Plan's participants with less money in their accounts. Respondents urge affirmance because, as the district court determined, Mr. Matney's factual allegations about the actual cost of the Plan's funds are contradicted by documents referenced in the complaint and his cost comparisons—offered to raise an inference of imprudence based on disparity in fees among comparable alternatives—do not provide meaningful benchmarks.

We start by describing ERISA's fiduciary duty of prudence. As we will explain, resolving this breach claim requires us to address a novel issue in this circuit: what must a plaintiff plead to plausibly allege plan fiduciaries breached their duty of prudence by offering more expensive investment options and charging fees higher than alternative plans in the marketplace? We then analyze Mr. Matney's complaint, focusing particularly on the allegations about investment management fees and recordkeeping fees. Ultimately, we discern no error in the district court's decision to dismiss the duty of prudence claim.

### 1

ERISA was enacted in 1974 with the explicit policy of protecting "the interests of participants in employee benefit plans," including retirement plans, "by establishing standards of conduct, responsibility, and obligation for fiduciaries." 29 U.S.C. § 1001(b). "Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place." *Conkright* v. *Frommert*, 559 U.S. 506, 516, 130 S.Ct. 1640, 176 L.Ed.2d 469 (2010). As a result, "ERISA represents a ' "careful balancing" between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans.' " *Id.* at 517, 130 S.Ct. 1640. (citation omitted).

To strike that balance, the statute mandates "plan fiduciaries must discharge their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.' " *Hughes*, 142 S. Ct. at 739 (quoting 29 U.S.C. § 1104(a)(1)(B)). The statute permits a participant or beneficiary to bring a civil action for fiduciary duty breaches. 29 U.S.C. § 1132(a)(2); *see also LaRue*, 552 U.S. at 251, 128 S.Ct. 1020. This includes "recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *LaRue*, 552 U.S. at 256, 128 S.Ct. 1020.

"[A]n ERISA fiduciary's duty is 'derived from the common law of trusts.' " *Tibble*, 575 U.S. at 528, 135 S.Ct. 1823 (citation omitted); *see also Ershick* v. *United Mo. Bank*, 948 F.2d 660, 666 (10th Cir. 1991) ("Congress, in enacting ERISA, did not explicitly enumerate all the powers and duties of trustees and other fiduciaries. Rather, Congress invoked the common law of trusts to define the general scope of their authority and responsibility.") (citation omitted). Looking to trust law, the Supreme Court has recognized ERISA imposes a fiduciary duty of prudence. *See Tibble*, 575 U.S. at 528-29, 135 S.Ct. 1823. This means a plan fiduciary must select prudent investments from the beginning and has a "continuing responsibility for oversight of the suitability of the investments already made." *Id.* at 529-30, 135 S.Ct. 1823 (quoting Uniform Prudent Investor Act § 2, Comment, 7B U.L.A. 21 (1995)). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530, 135 S.Ct. 1823.

**\*6**  "[T]he content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts," thus, "the appropriate inquiry will necessarily be context specific." *Hughes*, 142 S. Ct. at 742 (alteration in original) (quoting

*Dudenhoeffer*, 573 U.S. at 425, 134 S.Ct. 2459). "[T]he circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.* Ultimately, the duty "requires prudence, not prescience." *DeBruyne* v. *Equitable Life Assur. Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990) (citation omitted). When assessing a duty of prudence claim at the pleading stage, courts must engage in "careful, context-sensitive scrutiny of a complaint's allegations" in order to "divide the plausible sheep from the meritless goats." *Dudenhoeffer*, 573 U.S. at 425, 134 S.Ct. 2459.

Our circuit has yet to consider a plaintiff's pleading burden when the breach of the duty of prudence claim under ERISA arises in the specific context alleged here—that the Committee acted imprudently by offering higher cost funds and charging higher fees than comparatively cheaper options in the marketplace. Some of our sister circuits have addressed this issue, so we look to those decisions for guidance.

    *a. Meiners*

In *Meiners* v. *Wells Fargo & Company*, the plaintiff sued his former employer for breach of the duty of prudence for failing "to remove their inordinately expensive and underperforming funds from the [employee benefit plan's] options." 898 F.3d 820, 821 (8th Cir. 2018). The plaintiff alleged certain plan funds were "more expensive (due to higher fees) than comparable ... funds." *Id.* The district court dismissed the complaint for failure to state a claim, and the Eighth Circuit affirmed. *Id.* The court of appeals acknowledged the "challenging pleading burden" for "ERISA plaintiffs claiming a breach of fiduciary duty." *Id.* at 822. ERISA plaintiffs must rely on data "about the selected funds" in tandem with "circumstantial allegations about methods to show that 'a prudent fiduciary in like circumstances would have acted differently.' " *Id.* (citation omitted).

Notwithstanding these challenges, the Eighth Circuit held that "[t]o show that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the cost or performance of the selected fund, a plaintiff must provide a sound basis for comparison—*a meaningful benchmark*." *Id.* (emphasis added). Applying this standard, the *Meiners* court concluded the plaintiff alleged only "that cheaper alternative investments with *some* similarities exist[ed] in the marketplace" but this allegation was insufficient to show a "meaningful benchmark." *Id.* at 823. And, as another Eighth Circuit case later explained, "without a *meaningful* benchmark, the plaintiff[ ] [did] not create[ ] a plausible inference that the decision-making process itself was flawed." *Matousek* v. *MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022).

    *b. Sweda*

In *Sweda* v. *University of Pennsylvania*, the plaintiffs sued the fiduciaries of the University of Pennsylvania's defined-contribution retirement plan for breach of their fiduciary duties, including the duty of prudence. 923 F.3d 320, 324 (3d Cir. 2019). The plaintiffs alleged imprudence based on the plan's unreasonably high recordkeeping fees and "high-cost investment options" as "compared to available alternatives." *Id.* at 330-31. The district court dismissed the complaint under Rule 12(b)(6), *id.* at 325, and with respect to the duty of prudence of claim, the court of appeals reversed, *id.* at 331-32.

The Third Circuit concluded the plaintiffs' allegations were sufficient to raise a reasonable inference at the motion to dismiss stage that the defendants acted imprudently. *Id.* at 332. Specifically, the court determined the plaintiffs' allegations showed "that despite the availability of low-cost institutional class shares, [the defendant] selected and retained *identically managed* but higher cost retail class shares." *Id.* at 331 (emphasis added). The court also concluded plaintiffs raised the inference of imprudence by alleging the plan "paid between $4.5 and $5.5 million in annual recordkeeping fees at a time when similar plans paid $700,000 to $ 750,000 *for the same services*." *Id.* at 330 (emphasis added).

    *c. Smith*

**\*7** In *Smith* v. *CommonSpirit Health*, the plaintiff alleged breach of the duty of prudence by the fiduciaries of her defined-contribution retirement plan. 37 F.4th 1160, 1162 (6th Cir. 2022). She alleged the fiduciaries acted imprudently because the plan offered actively managed funds over lower cost, better performing passively managed funds and charged comparatively

excessive recordkeeping fees. *Id.* at 1164. The district court granted the motion to dismiss because "Smith failed to allege facts from which it could plausibly infer that CommonSpirit acted imprudently in violation of ERISA," and the court of appeals affirmed. *Id.*

Endorsing the district court's reasoning, the Sixth Circuit concluded that "a showing of imprudence [does not] come down to simply pointing to a fund with better performance." *Id.* at 1166. While recognizing that "pointing to an alternative course of action" such as an alternative fund that could have been offered, "will often be *necessary* to show a [fiduciary] acted imprudently," the *Smith* court concluded "that factual allegation is not by itself *sufficient*." *Id.* (emphases added). Rather, a meaningful comparison offered in support of imprudence by fiduciaries must take account of the "separate goals and separate risk profiles" of the funds at issue. *Id.* at 1167. As for the recordkeeping fee allegations, the court determined "Smith fail[ed] to give the kind of context" necessary to make her claim plausible, such as "plead[ing] that the services that CommonSpirit's fee covers are equivalent to those provided by the plans comprising the average in the industry publication that she cites." *Id.* at 1169.

   d. Albert

In *Albert* v. *Oshkosh Corporation*, the plaintiff, a former employee of Oshkosh, sued for breach of the duty of prudence based on the fiduciaries' "fail[ure] to adequately review" the employee defined-contribution plan's investment portfolio and payment of "unreasonably high fees for recordkeeping." 47 F.4th at 573. The district court dismissed Mr. Albert's complaint, and the Seventh Circuit affirmed. *Id.*

The court of appeals rejected the plaintiff's allegations "that some of the Plan's actively managed funds were too expensive." *Id.* at 581. Citing the meaningful-benchmark standard in *Meiners*, the court stated that "[i]n the absence of more detailed allegations providing a 'sound basis for comparison,' " the plaintiff could not plausibly plead imprudence. *Id.* at 582 (citation omitted). Likewise, the Seventh Circuit rejected the imprudence claim based on the allegedly too-high recordkeeping fees, concluding the complaint provided insufficient factual allegations about the recordkeeping services. *Id.* at 580.

***

We find these authorities persuasive. ERISA requires fiduciaries to exercise a duty of prudence in operating and managing plans on behalf of participants. And as our colleagues in the Third, Sixth, Seventh, and Eighth circuits confirm, there is no doubt a claim for breach of ERISA's duty of prudence can be based on allegations that the fees associated with the defined-contribution plan are too high compared to available, cheaper options. But to raise an inference of imprudence through price disparity, a plaintiff has the burden to allege a "meaningful benchmark." *Meiners*, 898 F.3d at 822. We thus adopt the approach to an ERISA plaintiff's pleading burden articulated by the Eighth Circuit in *Meiners*.[6]

[6]  Notably, this is the same standard employed by the district court and marshalled by the parties. *See* App. at 553 (reciting the "meaningful benchmark" standard from *Meiners* in concluding Mr. Matney's comparisons do not raise a plausible inference that the Committee used a "flawed monitoring and decisionmaking process"); *see* Aplt. Br. at 42-43; Aplees. Br. at 34-35, 37.

**\*8**  What makes a cost comparison meaningful? The answer to this question will depend on context because "the content of the duty of prudence" is necessarily "context specific." *Hughes*, 142 S. Ct. at 742 (citation omitted). As relevant here, when it comes to comparing investment management fees, a meaningful comparison will be supported by facts alleging, for example, the alternative investment options have similar investment strategies, similar investment objectives, or similar risk profiles to the plan's funds. *See Smith*, 37 F.4th at 1167 (explaining that funds with "separate goals and separate risk profiles" make "inapt comparators"); *Meiners*, 898 F.3d at 823 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [Plan's funds] were an imprudent choice at the outset.") (footnote omitted). Likewise, with recordkeeping fees, a comparison will be meaningful if the complaint alleges that the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan. *See Smith*, 37 F.4th at 1169 ("Smith has failed 'to allege that the fees were excessive relative to the services rendered.' ") (citation omitted); *Matousek*, 51 F.4th at 279

("[W]e cannot infer imprudence unless similarly sized plans spend less on the same services."). A court cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists; rather, the complaint must state facts to show the funds or services being compared are, indeed, comparable. The allegations must permit an apples-to-apples comparison.

Applying these principles here, the district court did not err in concluding the complaint failed to state a plausible claim for breach of the duty of prudence.

**2**

The complaint alleged the Committee breached ERISA's duty of prudence because the Plan offered funds with higher investment management fees—as measured by expense ratios—than other comparable investment options. The FAC included four cost comparisons to demonstrate the Committee acted imprudently. We describe each.

*First*, the FAC compared the expense ratio of eleven Plan funds against the median expense ratio of alternative funds within the same investment category, such as domestic equity or money market. According to the FAC, the Plan funds' expense ratios were taken from the individual funds' 2019 summary prospectuses, while the comparator median expense ratios were taken from the ICI Study. [7] The complaint alleged the various Plan funds had expense ratios significantly higher than the ICI Study median. Relying on the delta in investment management fees revealed by this comparison, Mr. Matney alleged the Committee was imprudent in selecting and managing the Plan's more expensive funds.

[7] The ICI Study is a report prepared by the Investment Company Institute compiling median expense ratio data from 2016 for different investment categories (i.e., domestic equity or money market). "The Investment Company Institute (ICI) is the leading association representing regulated investment funds.... ICI serves as a source for statistical data on the fund industry and conducts public policy research on fund trends, shareholder characteristics, the industry's role in the United States and international financial markets, and the retirement market." ICI Amicus Br. at 1.

*Second*, the FAC compared the costs of different share classes within a single mutual fund. [8] The cost comparison considered the expense ratios of nine JPMorgan SmartRetirement mutual funds within a share class known as R5 (R5 funds)—the ones offered by the Plan—against the expense ratios of the same JPMorgan mutual funds in a share class called R6 (R6 funds), which were not offered by the Plan. The complaint alleged the R5 funds were more expensive because they had expense ratios roughly ten basis points higher than the cheaper R6 funds. [9] Based on this cost comparison, Mr. Matney claimed the Committee's "failure to select the R6 share class was an indication of [its] failure to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds." App. at 117.

[8] "[M]ost mutual funds offer multiple 'share classes' to investors" where "each share class within a given fund is invested in an identical portfolio of securities" but "the classes have differing price structures." *Leimkuehler* v. *Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013).

[9] "A basis point is one one-hundredth of one percentage point (*i.e.*, 0.01%)[.]" Aplees. Br. at 8 n.5. We describe the difference between expense ratios for R5 and R6 funds in terms of basis points. *See Sacerdote* v. *New York Univ.*, 9 F.4th 95, 103 (2d Cir. 2021) (describing the fees charged by retirement investment firms in a breach-of-fiduciary-duty ERISA case using basis points); *see also Obeslo* v. *Great-West Life & Annuity Ins. Co.*, 6 F.4th 1135, 1144 (10th Cir. 2021) (describing the fees charged by an investment adviser in a breach-of-fiduciary-duty case under the Investment Company Act of 1940 using basis points).

*\*9 Third*, the FAC compared the cost of the Plan's R5 funds against a different investment product, collective trusts. The comparison showed the Plan's R5 funds had expense ratios about twelve basis points higher than the JPMorgan SmartRetirement CITs. The FAC also compared the R5 funds against Fidelity CITs, which allegedly "had the same investment goals as the

Case 1:22-cv-11053-RWZ   Document 42-1   Filed 09/19/23   Page 10 of 19
Matney v. Barrick Gold of North America, --- F.4th ---- (2023)
2023 WL 5731996

JPMorgan trust funds utilized by the Plan." App. at 123. This comparison showed the R5 funds had expense ratios roughly twenty basis points higher.

*Finally*, the FAC listed sixteen Plan funds, including the R5 funds, and compared them to other, available passively managed and alternative actively managed funds in the market.[10] The alternative funds listed were alleged to be "in the same investment style" as the Plan's funds. *Id.* at 126. The comparison alleged "the Plan's investment options were more expensive by multiples." *Id.* The FAC also compared the aggregate performance of actively managed funds against passively managed funds within various investment categories, alleging the passively managed funds performed better.

[10]   In an actively managed fund, "the portfolio manager actively makes investment decisions and initiates buying and selling of securities in an effort to maximize return." *Smith*, 37 F.4th at 1163 (citation omitted). By contrast, passively managed funds create "a fixed portfolio structured to match the overall market or a preselected part of it" and "require little to no judgment." *Id.* (citation omitted). Because passively managed funds "require little judgment and expertise," they are generally less expensive than actively managed funds. *Id.*

According to the district court, the FAC failed to plausibly state a breach of the duty of prudence based on the allegedly higher investment management fees because (1) the FAC "misstate[d] expense ratios of Plan funds" and (2) the FAC "ma[de] 'apples to oranges' comparisons that d[id] not plausibly [permit the court to] infer a flawed monitoring and decisionmaking process." *Id.* at 553. We agree with the district court.

*Allegations Contradicted by Documents*

Based on the difference in expense ratios, the FAC alleged the R5 funds offered by the Plan were more expensive than the R6 funds. According to Mr. Matney, this cost differential raised an inference that the Committee "fail[ed] to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available." App. at 117.

The district court found Mr. Matney's allegation implausible because the complaint misstated the expense ratios for the Plan's R5 funds.[11] According to documents referenced in the complaint, the Plan applied a 15 basis-point revenue credit to the overall cost of the R5 funds. The Master Trust Agreement showed a revenue credit applicable to "Non-Fidelity investment products" with a rate "the non-Fidelity vendor has agreed to use." Supp. App. at 128. The 2018 Form 5500 showed the revenue credit rate for the R5 funds was 0.15%. *Id.* at 314-17. This means the R5 funds were essentially discounted by 0.15%. From this, the district court concluded "the Plan's expense ratio for each JPMorgan R5 fund," App. at 548, was actually "less than Plaintiffs represent," *id.* at 552. Therefore, the district court could not infer imprudence based on the share cost comparison and JPMorgan CIT comparison provided in the complaint.

[11]   The district court—relying on *Gee* v. *Pacheco*, 627 F.3d 1178 (10th Cir. 2010)—concluded it could properly consider the following documents attached to Appellees' motion to dismiss: the 2018 Form 5500; The Master Trust Agreement; Barrick's Investment Policy; the 2019 Summary Prospectuses for JP Morgan Funds; the American Funds Target Date Retirement Fund Prospectuses; ICI Study; and the 401k Averages Book.
Although "[g]enerally, the sufficiency of a complaint must rest on its contents alone," this rule is not without exceptions, as the district court correctly determined. *Gee*, 627 F.3d at 1186 (citations omitted). A court may consider (1) "documents that the complaint incorporates by reference," (2) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," and (3) "matters of which a court may take judicial notice." *Id.* (citations omitted).
Here, Mr. Matney's complaint referenced all of the documents discussed by the district court and these materials were central to his claims. Thus, the district court properly considered the documents in its dismissal order. The district court relied on one additional document—the Fidelity FIAM Blend Target Date Fund Fact Sheet—that is not referenced in

the complaint. However, foregoing consideration of the FIAM Fact Sheet does not change our analysis or disposition. See *GFF Corp.*, 130 F.3d at 1384-85.

Mr. Matney made no argument on appeal directly challenging the district court's ability to rely on the aforementioned documents. Even if he had, such an argument would be unavailing. Though Mr. Matney appears to contend the district court improperly used the documents to draw inferences against him, he does not explain why the district court could not consider the documents in the first place. See *Adler* v. *Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived ...."); *Nixon* v. *City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong."). Thus, we discern no error in the district court's reliance on the aforementioned documents with the exception of the FIAM Fact Sheet, which we do not consider on appeal.

**\*10** On appeal, Mr. Matney challenges the district court's conclusion on two main grounds. First, he contends the district court improperly "took Defendants at their word" that the expense ratios for the Plan's R5 funds were inaccurate. Aplt. Br. at 34. Second, he insists the district court erred by applying the revenue credit when ascertaining the expense ratios because whether revenue sharing [12] is prudent "is not suitable for resolution" on a motion to dismiss. Reply Br. at 7. We are not persuaded.

[12]  Revenue sharing is a practice that takes "a portion of the investment-management fees collected through an expense ratio" to pay for recordkeeping fees. *Albert*, 47 F.4th at 574. "As a general matter, expense ratios and revenue-sharing payments move in tandem: the higher a given share class's expense ratio, the more the fund pays [the recordkeeper] in revenue sharing." *Leimkuehler*, 713 F.3d at 909.

First, as Appellees correctly point out, "[Mr.] Matney cannot survive a motion to dismiss merely by pointing to allegations refuted by the documents on which those allegations are based." Aplees. Br. at 30. Here, the Master Trust Agreement and the 2018 Form 5500 show the complaint misstates the actual expense ratios for the Plan's R5 funds. The district court did not err in refusing to accept as true factual allegations contradicted by these properly considered documents. See *GFF Corp.*, 130 F.3d at 1385.

That the R5 funds are actually less expensive than the R6 funds is significant. "[E]ach share class within a given fund is invested in an identical portfolio of securities ...." *Leimkuehler*, 713 F.3d at 909. Thus, share classes offer apples-to-apples comparisons, making a difference in price a meaningful data point. Where, as here, the Plan has not actually offered a more costly fund— that is, the documents referenced in the complaint establish that revenue sharing provided plan participants with a discount— there can be no plausible inference of imprudence.

Second, contrary to Mr. Matney's assertion, whether revenue sharing is an imprudent practice is not before us in this case. Mr. Matney insists whether applying a revenue credit—or using revenue sharing more generally—is imprudent involves facts that cannot be known to the plaintiff at the pleading stage. According to Mr. Matney, it is possible revenue sharing does not actually reduce costs, and absent more information about how a revenue sharing arrangement affects costs, dismissal is unwarranted.

We acknowledge that, as Mr. Matney seems to contend, the prudence of a plan's decision to use a revenue sharing strategy could present a question that would be inappropriate for resolution on a motion to dismiss. [13] For example, say a plaintiff alleges a plan's revenue sharing arrangement is imprudent, a defendant argues revenue sharing lowers costs, but the court has no factual basis to determine what is true. In such a scenario, the court adjudicating a motion to dismiss must accept the truth of the plaintiff's well-pled allegations, thus making the prudence of revenue sharing a potential issue for summary judgment or trial. But as Appellees correctly point out, no factual development is needed on this record to discern whether the revenue sharing arrangement used by the Plan actually reduced the cost of the R5 funds. The documents referenced in the complaint reveal the exact revenue credit used by the Plan and confirm it unquestionably yielded a lower cost share class fund for participants. The district court did not need to draw any inferences or speculate as to whether the revenue credit makes the Plan's offerings less expensive. The properly considered documents clearly showed it did.

13  Mr. Matney points to cases where, as here, defendants have argued revenue sharing reduced their plan's fees, yet courts have denied dismissal of a breach of the duty of prudence claim.
For example, in *Davis* v. *Salesforce.com, Inc.*, the Ninth Circuit concluded plaintiffs had plausibly alleged imprudence based on a cost comparison between share classes of the same fund. No. 21-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022) (unpublished). The defendants argued the share class offered by their plan included revenue sharing and, thus, was actually cheaper than alleged. *Id.* The court rejected this argument stating, "the judicially noticed documents ... contain ambiguities" and therefore the court could not determine "at the pleading stage" how revenue sharing affected the plan's costs. *Id.*
Similarly, in *Troudt* v. *Oracle Corp.*, the court rejected "defendants' proposal to dismiss Count I of the complaint on the *theory* that the plan's fee structure fell within a presumptively reasonable range of expense ratios." No. 1:16-cv-00175-REB-CBS, 2017 WL 1100876, at *2 (D. Colo. Mar. 22, 2017) (emphasis added) (unpublished). The court continued, emphasizing "the question is not 'whether a revenue-sharing model is within the range of reasonable choices a fiduciary might make,' but whether *this* revenue sharing arrangement was reasonable under all the circumstances." *Id.* (citation omitted). Likewise, in *Kong* v. *Trader Joe's Co.*, the court rejected the defendants' reliance on "a revenue sharing agreement" because "the agreement shows only what could occur in theory—not what occurred in fact." No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (unpublished). Thus, "drawing every reasonable inference in favor of Plaintiffs," the court reversed the district's court dismissal. *Id.*
But, as we explain, the question resolved in those cases is simply not presented in this one.

*Meaningful Benchmarks*

***11** The district court also concluded the complaint failed to plausibly allege imprudence because it lacked facts showing the remaining comparator funds were "meaningful benchmark[s]." App. at 553 (quoting *Meiners*, 898 F.3d at 822). Again, we agree with the district court.

*i.* Collective Trusts Comparator

Mr. Matney alleged the Plan's mutual funds, when compared to Fidelity CITs, were more expensive, thereby raising an inference that the Committee did not act prudently. The district court determined "there are substantive differences between mutual funds and CITs" so the comparison alleged in the complaint was not meaningful. *Id.* at 549.

On appeal, Mr. Matney argues the district court's "conclusion that 'CITs are not comparable investments' " implicates factual questions that are "improperly considered at the motion to dismiss" stage. Aplt. Br. at 39 (citation omitted). Appellees respond that Mr. Matney failed to plausibly allege the proposed CITs were "comparable to the Plan funds in all material respects other than expense ratio." Aplees. Br. at 39.

As an initial matter, we reject the notion that CITs could *never* be considered comparable to mutual funds. *See Hughes,* 142 S. Ct. at 742 (explaining "the appropriate inquiry" when assessing a duty of prudence claim "will necessarily be context specific"). On the facts of this case, however, we conclude the FAC did not sufficiently allege CITs are meaningfully comparable to the funds the Plan actually offered.

The FAC does allege "investments in the collective trusts are identical to those held by the mutual fund, except they cost less." App. at 120. This allegation provides no information about the goals or strategies of the various mutual funds or the CITs so as to establish their comparability. Without such factual allegations, it is not clear whether the CITs identified in the complaint "have different aims, different risks, and different potential rewards." *Smith*, 37 F.4th at 1166 (quoting *Davis* v. *Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020)). This sort of conclusory allegation is not enough to establish a meaningful

comparison. *See Brooks*, 985 F.3d at 1281 ("An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement.").

*ii. Actively Managed versus Passively Managed Comparators*

Next, the complaint compared the Plan's funds to alternative, less expensive, and better performing passively and actively managed funds. Mr. Matney alleged the Committee acted imprudently by not switching to the lower cost options. The district court concluded it could not draw such an inference because "the types of investments Plaintiffs [chose] for comparison" failed to account for "different investment strategies." *Id.* at 552.

On appeal, Mr. Matney argues the court erred by not recognizing he compared "materially similar but cheaper alternatives to the Plan's investment options." Aplt. Br. at 43 (quoting App. at 125). Mr. Matney also contends the district court "brushed over" his allegations that passively managed funds outperform actively managed funds. *Id.* at 44-45. According to Appellees, however, the FAC "does not plausibly allege that its proposed blend of alternative funds is comparable to the Plan funds." Aplees. Br. at 39. We agree with Appellees.

**\*12** The FAC contains a single allegation that the Plan's funds and the alternative actively and passively managed funds are comparable. The FAC states, "These alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial." App. at 126. But Mr. Matney does not support this conclusory allegation with any facts actually showing the "high correlation" of holdings. The FAC identifies many alternative funds and a variety of investment styles, making Mr. Matney's broad allegation insufficient to plausibly allege the funds *here* provide a meaningful benchmark.[14]

[14] As an example, the district court points to the American Funds Target Date Retirement funds—one of the comparisons in the FAC—as having "materially different investment strategies than the JPMorgan target date funds." App. at 552. The court cites to Appellees' motion to dismiss, which explains why the comparison is not meaningful:
> The American Funds Target Date Retirement prospectuses state that the funds are a "through" retirement fund, meaning that the funds include more high-risk asset allocations at and through retirement (*i.e.*, for approximately 30-years past 65).... Conversely, the prospectuses for the JPM Funds make clear that they are "to" retirement funds, meaning the fund "intends to reach its most conservative strategic target allocations around the end of the year of the target retirement date."
> 
> *Id.* at 165 n.8.

As the Sixth Circuit soundly recognized, "each fund has distinct goals and distinct strategies" making a "side-by-side comparison of how two funds performed ... with no consideration of their distinct objectives" unhelpful for determining which is the more prudent choice. *Smith*, 37 F.4th at 1167; *see also Meiners*, 898 F.3d at 823 (explaining it is insufficient to allege "that cheaper alternative investments with *some* similarities exist in the marketplace"). So too here. Absent facts alleging the better performing actively and passively managed funds are similar enough to the Plan's funds, the complaint fails to supply a meaningful benchmark for comparison. We cannot say the district court erred by refusing to infer imprudence under these circumstances.[15]

[15] To the extent Mr. Matney contends his general allegation that actively managed funds—like those offered by the Plan—underperform passively managed funds is sufficient to state a claim for breach of fiduciary duty, we disagree. It is uniformly recognized imprudence cannot be inferred based solely on allegations identifying the existence of lower cost or better performing alternative funds. *See Smith*, 37 F.4th at 1166 ("Nor does a showing of imprudence come down to simply pointing to a fund with better performance."); *Meiners*, 898 F.3d at 823-24 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice.") (emphasis omitted); *Davis*, 960 F.3d at 484 ("For an investment-by-investment challenge like this one, a complaint

cannot simply make a bare allegation that costs are too high, or returns are too low."); *Albert*, 47 F.4th at 581 ("The fact that actively managed funds charge higher fees than passively managed funds is ordinarily not enough to state a claim because such funds may also provide higher returns.").

*iii.* ICI Study Comparator

Recall, the ICI Study is a report compiling 2016 data to show the median expense ratio for various investment categories, like domestic equity or money market funds. The FAC compared several Plan funds in different investment categories against corresponding median expense ratios from the ICI Study. The district court concluded the expense ratios from the ICI Study do not allow for a meaningful comparison because the study only accounts for median data about broad categories of investments. App. at 546. Quoting from the study, the court "not[ed] that 'the expense ratios applicable to funds vary within a given investment category,' " making an apples-to-apples comparison impossible. *Id.* (quoting Supp. App. at 609).

 **\*13**  On appeal, Mr. Matney insists the ICI Study is an appropriate benchmark because it shows how much more expensive the Plan's costs were, thus "highlight[ing] a glaring failure in the Plan's fiduciaries' investment selection and monitoring process." Aplt. Br. at 46. Mr. Matney also argues "[s]everal courts have upheld claims based in part on the [study]." *Id.* Appellees assert the comparison to the ICI study "does not plausibly allege imprudence without the further allegation (absent from the FAC) that the expense ratios for the Plan's funds correspond to fund-management activities similar to those of the funds covered by the ICI Study." Aplees. Br. at 45. Again, we agree with Appellees.

A comparison to median expense ratios in broad investment strategy categories, without more, does not provide the "meaningful benchmark" necessary to satisfy a plaintiff's pleading burden in this context. A median expense ratio derived from a broad range of funds—for example, all funds within the domestic equity investment category—reveals no information about how the specific funds within that category operate. Mr. Matney's complaint does not describe how the individual funds used in the ICI study actually compare to the Plan's funds. Accordingly, there is an insufficient factual basis to support a reasonable inference of imprudence. *See Matousek*, 51 F.4th at 282 ("There is no way to compare the large universe of funds—about which we know little—to the risk profiles, return objectives, and management approaches of the funds in MidAmerican's lineup.... [T]he aggregate data fails 'to connect the dots in a way that creates an inference of imprudence.' ") (citation omitted).

\*\*\*

For these reasons, the district court correctly determined the complaint failed to plausibly state a claim that the Committee was imprudent in offering funds with higher cost investment management fees.

3

Next, we address Mr. Matney's imprudence claim based on the allegedly higher recordkeeping fees. Recall, "[a]dministrative or record-keeping expenses pay for the day-to-day operations of the plan itself." *Davis*, 960 F.3d at 482. This can include services such as "recordkeeping, accounting, legal, and trustee services, as well as services that are provided directly to plan participants, such as educational seminars, access to customer service representatives, and the provision of benefits statements." ICI Amicus Br. at 12-13.

The FAC alleged the Committee breached its fiduciary duty by "fail[ing] to prudently manage and control the Plan's recordkeeping and administrative costs." App. at 133. The complaint alleged two examples of such imprudence. First, the FAC pointed to the Committee's failure to solicit regular Requests for Proposals (RFP) as indicative of its imprudence. Second, the FAC contrasted the Plan's recordkeeping fees with average recordkeeping fees for smaller defined-contribution plans—those under $200 million in assets—derived from a data source known as the 401k Averages Book. [16] Mr. Matney compared the

Matney v. Barrick Gold of North America, --- F.4th ---- (2023)
2023 WL 5731996
Case 1:22-cv-11053-RWZ   Document 42-1   Filed 09/19/23   Page 15 of 19

$5 per participant average recordkeeping fee from the 401k Averages Book [17] against an estimate of the Plan's annual per participant fee of $60. We address each allegation in turn.

[16] Recall, the Plan qualified as a large plan because, at all times relevant to this case, it had at least $500 million in assets.

[17] According to the FAC, "the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." App. at 133 n.16 (quoting 401k Averages Book 2 (20th ed. 2020)).

*Requests for Proposals*

The FAC alleged the Committee's failure to "send out RFPs to try to obtain lower recordkeeping costs" raised an inference of imprudence. App. at 133. According to the FAC, "an RFP should happen at least every three to five years as a matter of course," and although not explicitly stated, the inference was the Committee did not do this. *Id.* at 132.

**\*14** The district court determined there was nothing imprudent about the Committee's RFP process as alleged in the complaint. The court explained "nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval." *Id.* at 558. Moreover, the court found "there is no question that [the Committee] regularly re-negotiated their fee arrangement with Fidelity, resulting in lower costs for participants." *Id.*

Mr. Matney challenges the district court's conclusion on two grounds. First, he asserts the district court misunderstood his allegation about the need for an RFP process. Aplt. Br. at 51. He was not alleging, as the district court seemed to think, that an RFP process necessarily would have resulted in lower fees. Mr. Matney acknowledges there is no "guarantee that an RFP process would have resulted in lower fees than those negotiated with Fidelity." *Id.* Rather, Mr. Matney argues "a prudent fiduciary would have conducted an RFP at reasonable intervals 'to determine whether the Plan could obtain better recordkeeping and administrative fee pricing.'" *Id.* (citation omitted). According to Appellees, "courts have held that 'a failure to regularly solicit quotes or competitive bids from service providers' does not 'breach[ ] the duty of prudence.'" Aplees. Br. at 52 (alteration in original) (quoting *Albert*, 47 F.4th at 579). We are persuaded by Appellees.

Simply alleging the Committee needed to conduct regular RFPs does not raise a plausible inference of imprudence in this case. *Dudenhoeffer*, 573 U.S. at 425, 134 S.Ct. 2459 ("Because the content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." (quoting § 1104(a)(1)(B))). This is particularly true here, where the allegations show the Committee "regularly re-negotiated their fee arrangement with Fidelity, resulting in lower costs for participants." App. at 558.

Second, Mr. Matney asserts the district court improperly concluded, contrary to the standards applicable on a motion to dismiss, that Appellees' fee negotiations were reasonable. He contends "there is no presumption of prudence on the part of Defendants just because the recordkeeping fees were reduced over the years" and "the mere fact that Defendants may or may not have obtained lower fees does not mean that the fees were reasonable." Aplt. Br. at 53. But the district court applied no such presumption.

The complaint alleged "the cost per participant was $101 in 2014 and $85 in 2015 [and] [b]eginning on January 1, 2017, Fidelity purportedly charged a flat $68 per participant annually and $53 per participant as of April 2020." App. at 132. The court accepted these well-pleaded facts as true. *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. Based on these allegations—showing the Plan's recordkeeping fees became cheaper over time—the court determined Mr. Matney had failed to offer allegations "giv[ing] rise to a reasonable inference that the Committee violated its fiduciary duty." App. at 558. We discern no error, and Mr. Matney has offered no contrary availing argument.

*401k Averages Book*

The FAC also compared the average recordkeeping fees from the 401k Averages Book against the Plan's recordkeeping fees. The FAC acknowledged the 401k Averages Book "studies Plan fees for smaller plans, those under $200 million in assets" but alleged "it is nonetheless a useful resource because we can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping." App. at 133. According to the complaint, the 401k Averages Book was a meaningful benchmark "because recordkeeping and administrative fees should *decrease* as a Plan increases in size." [18] *Id.* Based on the 401k Averages Book, the FAC alleged the recordkeeping costs for a smaller plan are $5 per participant. Thus, when compared with the Plan's conservative estimate of recordkeeping fees—estimated by the FAC at roughly $60 per participant per year—it could be inferred that the Committee acted imprudently.

[18]   Appellees take issue with this allegation. *See* Aplees. Br. at 49-50 (citing *Smith*, 37 F.4th at 1169). However, on a motion to dismiss we view the well-pleaded facts in the light most favorable to Mr. Matney. *See Clinton*, 63 F.4th at 1275. Thus, for purposes of this appeal, we accept the allegation that administrative fees should decrease as a Plan size increases.

**\*15**  The district court concluded the FAC did not "create[ ] a reasonable inference that the Committee violated the duty of prudence through its fee arrangement with Fidelity." *Id.* at 557. The court determined the 401k Averages Book was not a meaningful benchmark and the FAC "make[s] a leap" based on averages "that is too far removed to create anything more than the 'mere possibility' of misconduct." *Id.* This, the district court concluded, was not enough to "nudge the claim 'across the line from conceivable to the plausible.' " *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

On appeal, Mr. Matney insists the 401k Averages Book provides a useful comparison because it confirms "recordkeeping costs drop as a plan increases in size." Aplt. Br. at 49. Mr. Matney also points to language from the Master Trust Agreement, referenced in the FAC, describing the Plan's services as merely "ministerial in nature" and not due to services "above and beyond normal activity." Reply Br. at 19; *see also* Supp. App. at 21-22. We are unpersuaded.

In *Matousek* v. *MidAmerican Energy Company*, the Eighth Circuit considered a claim similar to the one alleged here. There, the plaintiff—suing the fiduciaries of his employer-sponsored defined-contribution plan for "let[ting] recordkeeping expenses spiral out of control," 51 F.4th at 278—compared the fees charged by his plan for recordkeeping against the fees reported in the 401k Averages Book, *id.* at 280. The district court dismissed the complaint, and the court of appeals affirmed. *Id.* at 277-78. The Eighth Circuit recognized that "the key to stating a plausible excessive-fees claim is to make a like-for-like comparison." *Id.* at 279. In the context of a breach of the duty of prudence, "the way to plausibly plead a [recordkeeping fees] claim ... is to identify similar plans offering the same services for less." *Id.* The 401k Averages Book, the court concluded, did not allow for such a comparison. *Id.* at 280; *see Smith,* 37 F.4th at 1169 (holding plaintiff did not plausibly state a claim for breach of the duty of prudence based on the high cost of recordkeeping where complaint "failed 'to allege that the fees were excessive relative to the services rendered' ") (citation omitted); *accord Albert*, 47 F.4th at 582 (holding plaintiff failed to "provide 'the kind of context' " needed to plausibly show the plan's recordkeeping fees were high relative to the services provided) (citation omitted).

So too here. Mr. Matney proceeds by way of comparison, so he has the burden to provide meaningful benchmarks. As discussed, the relevant comparative data point in this context is the services offered for the price charged. But Mr. Matney fails to offer factual allegations about the services provided either by Barrick Gold's plan or the plans assessed in the 401k Averages Book. The FAC acknowledges "it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services." App. at 130. Yet Mr. Matney claims, without elaboration, the Plan's recordkeeping services were "ministerial in nature." *Id.* (citation omitted). The district court did not have to take as true this mere conclusory statement. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Moreover, Mr. Matney's allegation that the Plan's services were only "ministerial in nature" seems contradicted by the Master Trust Agreement, which lists education services to participants, the availability of service representatives, and individual participant loan tracking as the types of services offered. [19] *See* Supp. App. at 51-54.

19  Before filing his complaint, Mr. Matney had access to the Master Trust Agreement, *see* Supp. App. at 15-16, which outlines the recordkeeping services provided by the Plan. Cf. *Braden* v.*Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009) ("[W]e note that Braden could not possibly show at this stage in the litigation that the revenue sharing payments were unreasonable in proportion to the services rendered because the trust agreement between Wal-Mart and Merrill Lynch required the amounts of the payments to be kept secret.").

**\*16** Significantly, the FAC also alleges no information about the recordkeeping services offered by the plans analyzed in the 401k Averages Book. As the Eighth circuit explained, "It is almost impossible to tell if these figures [in the 401k Averages Book] provide a meaningful benchmark" as "they leave out the total fees charged for individualized services like 'loans' and 'distributions.' " *Matousek*, 51 F.4th at 280. Absent this information, Mr. Matney has not "created a plausible inference that the decision-making process itself was flawed." *Id.*

\*\*\*

For these reasons, we affirm the district court's dismissal of Mr. Matney's claim that the Committee "wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs." App. at 133.

C

We turn now to Mr. Matney's duty to monitor claim against Barrick Gold and the Board. Recall, Mr. Matney alleged Barrick Gold and the Board "had the authority to appoint and remove members of the Committee" and "[i]n light of this authority" had a duty to ensure the Committee was "adequately performing their fiduciary obligations."[20] App. at 137. The district court dismissed Mr. Matney's duty to monitor claim because it was "fully dependent on the validity of [his] breach of fiduciary duty claims." *Id.* at 561. Thus, Mr. Matney's failure to "adequately allege[ ] a claim for breach of the duty of prudence or the duty of loyalty" foreclosed his duty to monitor claim. *Id.* On appeal, Mr. Matney contends the district court erred. We disagree.

20  Appellees do not argue on appeal, nor did they argue in the district court, that Barrick Gold and the Board had no duty to monitor the Committee's performance. As such, we assume for purposes of this appeal that Barrick Gold and the Board had such a duty. This is a safe assumption. ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan ... thus expanding the universe of persons subject to fiduciary duties ...." *Mertens* v. *Hewitt Assocs.*, 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *see also* 29 C.F.R. § 2509.75-8, question D-4 (explaining boards of directors may be subject to a fiduciary duty to monitor other fiduciaries if they are responsible for the selection and retention of those fiduciaries).

Mr. Matney conceded the duty to monitor claim was derivative of his other fiduciary duty claims before the district court. In the motion to dismiss hearing, Mr. Matney's lawyer said, "Obviously, the failure to monitor is dependent on the Court upholding the duty of prudence." App. at 416. And on appeal, the parties appear to agree Mr. Matney's duty to monitor claims "rise or fall with his duty of prudence and duty of loyalty claims." Aplees. Br. at 55 (quoting *Albert*, 47 F.4th at 583).[21]

21  The parties' apparent agreement on this point reflects a consensus among the circuits that have passed on the issue. *See, e.g.*, *Albert*, 47 F.4th at 583; *In re Allergan ERISA Litigation*, 975 F.3d 348, 354 n.11 (3d Cir. 2020) (finding duty to monitor claim "must fail" unless "underlying breach of fiduciary duty [of prudence and loyalty] claims survive") (internal quotation marks and citation omitted) (alteration in original); *Singh* v. *RadioShack Corp.*, 882 F.3d 137, 150 (5th Cir. 2018) ("[D]uty-to-monitor claims recognized by other courts inherently require a breach of duty by the appointed fiduciary."); *Rinehart* v. *Lehman Bros. Holdings, Inc.*, 817 F.3d 56, 68 (2d Cir. 2016) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor ... absent an underlying breach of the duties imposed under ERISA" by plan

fiduciaries) (internal quotation marks and citation omitted); *Brown* v. *Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010) (holding duty to monitor claim "can[not] survive without a sufficiently pled theory of an underlying breach").

***17** Accordingly, because we affirm the district court's dismissal of Mr. Matney's duty of prudence claim, we also affirm the district court's decision to dismiss the duty to monitor claim.[22]

[22] Without elaboration, Mr. Matney insists his complaint "contains similar factual allegations against the Monitoring Defendants that have been upheld in analogous cases." Aplt. Br. at 54 (citing *Johnson* v. *Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 465 67 (N.D. Cal. 2017) (holding plaintiffs' allegations that the defendants failed to monitor the plan's named fiduciary were "within the realm of plausible")). Mr. Matney's argument on this front is undeveloped and does not disturb our conclusion that dismissal of the duty to monitor claim is warranted under the circumstances before us.

### D

Last, we address Mr. Matney's challenge to the district court's denial of his Rule 59(e) motion. "Rule 59(e) permits a court to alter or amend a judgment," "when 'the court has misapprehended the facts, a party's position, or the controlling law.'" *Nelson* v. *City of Albuquerque*, 921 F.3d 925, 929 (10th Cir. 2019) (citations omitted). Mr. Matney filed a Rule 59(e) motion asking the court "to modify its final judgment" to allow him to amend his complaint. App. at 581. According to Mr. Matney, the district court should have reconsidered the dismissal because the law surrounding the pleading standards for an ERISA duty of prudence claim was rapidly developing and had changed since he first filed his complaint. But Mr. Matney failed to appeal the district court's order denying his Rule 59(e) motion. As we explain, we lack jurisdiction to consider his argument on appeal.[23]

[23] Mr. Matney reprises on appeal several challenges he made in support of his motion for reconsideration, claiming the district court misapplied the principles outlined in *Hughes* and failed to properly consider two recent Ninth Circuit cases —*Davis* v. *Salesforce.com, Inc.*, 2022 WL 1055557, and *Kong* v. *Trader Joe's Co.*, 2022 WL 1125667. To the extent Mr. Matney offers these arguments as the bases for reversing the denial of his motion to reconsider, we lack jurisdiction to consider them. Nor do these challenges disturb our conclusion to affirm the district court's ruling on the motion to dismiss. The district court took a "context-specific" approach to analyzing Mr. Matney's duty of prudence claim, so it aligns with the approach in *Hughes*. With respect to the Ninth Circuit authority, the district court was free to reject those cases, *see Grimland* v. *United States*, 206 F.2d 599, 601 (10th Cir. 1953) ("[W]e are not bound by the decisions of other courts of appeals ...."), and we have already detailed why neither case is persuasive under the circumstances here.

Under Federal Rule of Appellate Procedure 4(a)(4)(B)(ii), "A party intending to challenge an order disposing of [a Rule 59 motion], or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal ...." Put differently, "When an appellant challenges an order ruling on a motion governed by Appellate Rule 4(a)(4)(B)(ii), a new or amended notice of appeal is necessary ...." *Husky Ventures, Inc.* v. *B55 Invs., Ltd.*, 911 F.3d 1000, 1010 (10th Cir. 2018); *see also Breeden* v. *ABF Freight Sys., Inc.*, 115 F.3d 749, 752 (10th Cir. 1997) ("Because [appellant] did not amend his notice of appeal, we lack jurisdiction to consider his appeal from the pre-judgment interest matters disposed of in the ruling on his Rule 59(e) motion.").

***18** Mr. Matney filed his Rule 59(e) motion on May 19, 2022, one day before he filed a timely notice of appeal from the order granting the motion to dismiss. App. at 644. On June 21, 2022, the district court denied the Rule 59(e) motion, but Mr. Matney did not amend his notice of appeal or file a new one. Under these circumstances, we lack the power to consider the merits of any arguments challenging the district court's ruling on Mr. Matney's Rule 59(e) motion.[24] *See Breeden*, 115 F.3d at 752.

[24] Mr. Matney does not argue on appeal that the district court erred because it dismissed his complaint with prejudice. Instead, he asserts that the district court should have allowed him to file a second amended complaint. Recall, however,

Mr. Matney amended his complaint once as a matter of course but did not seek leave to amend again prior to judgment. Therefore, the court was under no obligation to allow him to amend again in the absence of a proper request. *See Calderon* v. *Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1185 (10th Cir. 1999) ("[A] party has a right to amend the pleading one time without seeking leave of court" but "[a]fter a responsive pleading, a party must seek leave of the court to amend by filing a motion." (citing Fed. R. Civ. P. 15(a))).

### III

We **AFFIRM** the district court's order granting the motion to dismiss the first amended complaint and dismissing Mr. Matney's action with prejudice.

**All Citations**

--- F.4th ----, 2023 WL 5731996

---

End of Document                                             © 2023 Thomson Reuters. No claim to original U.S. Government Works.