86 F.4th 961
United States Court of Appeals, Second Circuit.

Casey CUNNINGHAM, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, and Joy Veronneau, individually and as representatives of a class of participants and beneficiaries on behalf of the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan, Plaintiffs-Appellants-Cross-Appellees,

v.

CORNELL UNIVERSITY, The Retirement Plan Oversight Committee, Mary G. Opperman, and CapFinancial Partners, LLC d/b/a CAPTRUST Financial Advisors, Defendants-Appellees-Cross-Appellants.[*]

[*]  The Clerk of Court is respectfully directed to amend the caption accordingly.

Nos. 21-88-cv; 21-96-cv; 21-114-cv
|
August Term 2022
|
Argued: October 19, 2022
|
Decided: November 14, 2023

**Synopsis**

**Background:** Participants in and beneficiaries of retirement plans administered by private university brought class action against university and its appointed fiduciaries, alleging various breaches of fiduciary duties in violation of Employee Retirement Income Security Act (ERISA). The United States District Court for the Southern District of New York, P. Kevin Castel, Senior District Judge, granted defendants' motion to dismiss some of claims for failure to state a claim, 2017 WL 4358769, granted defendants' motion for summary judgment and to exclude in part, 2019 WL 4735876, and denied defendants' motion to strike jury demand, 2018 WL 4279466. Plaintiffs appealed, and defendants conditionally cross-appealed.

**Holdings:** The Court of Appeals, Livingston, Chief Judge, held that:

as matter of first impression, in order to plead violation of ERISA provision prohibiting fiduciary from furnishing services between plan and party in interest, complaint had to plausibly allege that fiduciary caused plan to engage in transaction that constituted furnishing of services between plan and party in interest where that transaction was unnecessary or involved unreasonable compensation, thereby supporting an inference of disloyalty;

plan participants and beneficiaries failed to state claim alleging that university entered into prohibited transaction, in violation of its fiduciary duty under ERISA;

District Court did not improperly parse claim, at motion to dismiss stage of litigation, by separately addressing each of six categories of allegations made in one of fiduciary duty claims and holding that only two succeeded in stating claims, while dismissing others for failure to state claim; and

university and administrators were not liable for breach of duty of prudence under ERISA.

Affirmed; cross-appeals dismissed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment; Motion to Dismiss for Failure to State a Claim; Motion to Exclude Expert Report or Testimony; Motion to Strike.

**\*967**  Appeal from the United States District Court for the Southern District of New York (Castel, *J.*)

**Attorneys and Law Firms**

For Plaintiffs-Appellants-Cross-Appellees: Sean E. Soyars (Jerome J. Schlichter, Heather Lea, and Joel D. Rohlf, on the brief), Schlichter Bogard & Denton LLP, St. Louis, MO.

For Defendants-Appellees-Cross-Appellants: Michael A. Scodro (Nancy G. Ross, Samuel P. Myler, and Jed W. Glickstein, on the brief), Mayer Brown LLP, Chicago, IL; Michelle N. Webster, on the brief, Mayer Brown LLP, Washington, DC, for Cornell University, The Retirement Plan Oversight Committee, and Mary G. Opperman. Caroline A. Wong (Eric S. Mattson, Joseph R. Dosch, and Meredith R. Aska McBride, on the brief), Sidley Austin LLP, Chicago, IL, for CapFinancial Partners, LLC. Jaime A. Santos and William M. Jay, Goodwin Procter LLP, Washington, DC; James O. Fleckner and Alison V. Douglass, Goodwin Procter LLP, Boston, MA; Stephanie A. Maloney, U.S. Chamber Litigation Center, Washington, DC, for Chamber of Commerce of the United States of America and American Benefits Council, amici curiae in support of Defendants-Appellees-Cross-Appellants.

Before: Livingston, Chief Judge, and Kearse and Park, Circuit Judges.

**Opinion**

Debra Ann Livingston, Chief Judge:

**\*\*1  \*968** This case is one of a number of similar actions filed in federal courts across the country alleging that university pension plans, known as "403(b) plans," have been improperly managed in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq*. Plaintiffs-Appellants-Cross-Appellees Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, and Joy Veronneau ("Plaintiffs") are participants in and beneficiaries of the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca ("Retirement Plan") or the Cornell University Tax Deferred Annuity Plan ("TDA Plan") (together, the "Plans").

Plaintiffs, individually and as representatives of a class of beneficiaries to the Plans, brought this action in the Southern District of New York (Castel, *J.*) against Cornell University ("Cornell") and its appointed fiduciaries (together, "Defendants"), alleging that they, among other things, failed to employ adequate processes for monitoring the Plans in violation of 29 U.S.C. § 1104, resulting in the retention of underperforming investment options and the payment of excessive fees, and engaged in transactions prohibited under 29 U.S.C. § 1106. Following motion practice, the district court dismissed or granted summary judgment to Defendants on all but one of Plaintiffs' claims. After a settlement was reached on the remaining claim, the district court entered judgment on December 22, 2020.

Plaintiffs challenge the district court's award of summary judgment on two counts alleging that Defendants breached their duty of prudence. In addition, Plaintiffs argue that the district court erred in dismissing one of their prohibited transactions claims for failure to state a claim and in parsing one of their claims for a breach of the duty of prudence at the motion-to-dismiss stage. Should the case be remanded to the district court, Plaintiffs also argue that the end date of the class period should be vacated. Defendants conditionally cross-appeal, in the event that the judgment is not affirmed, from the district court's denial of their motion to strike the jury demand.

We conclude that the district court correctly dismissed Plaintiffs' prohibited transactions claim and certain duty-of-prudence allegations for failure to state a claim and did not err in granting partial summary judgment to Defendants on the remaining duty-

of-prudence claims. In so doing, we hold as a matter of first impression that to state a claim for a prohibited transaction pursuant 29 U.S.C. § 1106(a)(1)(C), it is not enough to allege that a fiduciary caused the plan to compensate a service provider for its services; rather, the complaint must plausibly allege that the services were unnecessary or involved unreasonable compensation, *see id.* § 1108(b)(2)(A), thus supporting an inference of disloyalty. Because we affirm the district court's judgment, we do not reach the issues related to the end date of the class period, and we dismiss Defendants' conditional cross-appeals as moot.

## *969 BACKGROUND

### I. Factual Background

**\*\*2** Plaintiffs represent a class of current and former Cornell employees who participated in Cornell's two retirement plans, the Retirement Plan and the TDA Plan, from August 17, 2010 to August 17, 2016 (the "class period"). As of 2016, the Retirement Plan had over 19,000 participants and nearly $2 billion in net assets and the TDA Plan had over 11,000 participants and $1.34 billion in net assets. Both Plans are defined-contribution savings plans that are tax-deferred under 26 U.S.C. § 403(b), which applies to certain tax-exempt organizations. In a defined-contribution plan (of which the more familiar "401(k)" plans are another type) participants maintain individual investment accounts, the value of which "is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525, 135 S.Ct. 1823, 191 L.Ed.2d 795 (2015); *see* 29 U.S.C. § 1002(34).[1] The administrators of defined-contribution plans are responsible for choosing a menu of investment options, and plan participants then choose their investments from that menu.

[1]  Participants' accounts in the Retirement Plan are funded by a combination of employer and participant contributions, while the TDA Plan is funded entirely by employee contributions.

### A. Administration of the Plans

Cornell University is the named administrator for the Plans. Cornell delegated administrative responsibilities to Mary G. Opperman, Cornell University's Vice President for Human Resources, who in turn delegated certain responsibilities to Paul Bursic, Senior Director of Benefits Services and Administration (the "Benefits Department"), and employees under his direction. Opperman chaired the Retirement Plan Oversight Committee ("RPOC," and, together with Opperman and Cornell, the "Cornell Defendants"). The RPOC was established in 2010, in response to Internal Revenue Service regulations, to oversee the Plans. In 2011, the RPOC issued a Request for Proposal for a third-party consultant to assist the RPOC with selecting investment options and recordkeeping. After reviewing bids, the RPOC selected CapFinancial Partners, LLC Financial Advisors ("CAPTRUST") as the Plans' investment advisor and plan administration consultant. As part of its agreement with Cornell, CAPTRUST agreed to serve as a fiduciary under ERISA with regard to the selection of mutual funds available to the Plans.

### B. Recordkeeping Fees and Investment Options

In any defined-contribution plan, participants incur certain fees and expenses. Two kinds of fees are at issue in this case: investment management fees and recordkeeping fees. Investment management fees are charged by the investment providers and are associated with the services of buying, selling, and managing investments. Investment fees are typically expressed as an "expense ratio," that is, a percentage of the assets under management. For mutual funds, some providers offer different share classes of the same fund: a "retail" share class available to all investors at one expense ratio and "institutional" share classes with lower expense ratios available only to investors that satisfy certain minimum investment amounts—typically institutional investors.

Recordkeeping fees cover necessary administrative expenses such as tracking account balances and providing regular account statements. Recordkeeping fees are charged either as a flat fee, with each fund participant paying a set amount, or by **\*970** "revenue sharing," in which the fund pays the recordkeeper a set portion of the fund's expense ratio. Recordkeeping services may be provided by the investment providers themselves or by third parties. Throughout the class period, Cornell retained two investment providers who also both served as the Plans' recordkeepers: Teachers Insurance and Annuity Association of America-College Retirement Equities Fund ("TIAA-CREF" or "TIAA") and Fidelity Investments Inc. ("Fidelity"). Both TIAA and Fidelity received recordkeeping fees through a revenue sharing model.

**\*\*3** The Plans offered approximately 300 investment options throughout the class period, including fixed annuities (in which the investment returns a contractually specified minimum interest rate), variable annuities (in which the investment returns a variable interest rate), and mutual funds.

## II. Procedural History

Plaintiffs filed their Corrected Amended Complaint (the "Complaint") on February 24, 2017, and named as defendants Cornell, the RPOC, Opperman, and CAPTRUST. The Complaint alleged that Defendants violated their fiduciary duties under ERISA by failing to monitor and control the recordkeeping fees paid to TIAA and Fidelity, by failing to review the fees and performances associated with the Plans' investment options, and by entering into certain prohibited transactions.

### A. The Alleged ERISA Violations

ERISA imposes various duties on fiduciaries, two of which are relevant here. The first is the duty of loyalty, which requires that the fiduciary act "solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries[ ] and ... defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(i)–(ii). The second is the duty of prudence, which requires that the fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B); *see also Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 715–17 (2d Cir. 2013) (discussing the "prudent man" standard of care).

Another section of ERISA, 29 U.S.C. § 1106, "codif[ies]," *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987), and "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries, [29 U.S.C. § 1104(a)(1)], by categorically barring certain transactions deemed 'likely to injure the [retirement] plan,' " *Harris Trust & Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (citation omitted). These barred transactions are known as "prohibited transactions." 29 U.S.C. § 1106. Though "[t]he standards for fiduciary conduct in §§ 1104 and 1106 may overlap," breaching one of these provisions "does not necessarily" imply that the other has been violated as well. *Sweda v. Univ. of Pa.*, 923 F.3d 320, 327 (3d Cir. 2019).

The Complaint alleged that Cornell and its appointed fiduciaries violated their duties of prudence and loyalty under ERISA by: (1) offering certain products—namely, the CREF Stock Account and Money Market Account, as well as the TIAA Traditional Annuity ("Count I"); (2) failing to monitor and control recordkeeping fees ("Count III"); and (3) failing to monitor and offer appropriate investment options ("Count V"). Plaintiffs also brought prohibited transactions claims on each of **\*971** these three theories ("Counts II, IV, and VI," respectively). And in Count VII, Plaintiffs brought a claim premised on Cornell's and Opperman's general failure to monitor the appointed fiduciaries.[2]

2     Plaintiffs' failure to monitor claim is the seventh claim for relief though it is incorrectly labeled in the Complaint as "Count VIII."

**\*\*4** As noted by the district court, Count V spans a number of allegations that Defendants breached their fiduciary duty, specifically that they breached by:

(1) continuing to offer the CREF Stock Account and TIAA Real Estate Account despite their high fees and poor performance;

(2) selecting and retaining investment options, including actively managed funds, with high fees and poor performance relative to other investment options that were readily available to the Plans;

(3) selecting and retaining high-cost retail [class shares of] mutual funds instead of materially identical lower[-]cost institutional mutual funds [(i.e., the "share-class claim")];

(4) selecting and retaining investment options with unnecessary layers of fees;

(5) failing to consolidate the Plans' investment options into a "core lineup," depriving the Plans of their ability to qualify for lower cost share classes of certain investments and causing confusion among plan participants; [and]

(6) failing to monitor any of the Plans' options until October 1, 2014, and monitoring only "core" investment options after that date.

*Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2017 WL 4358769, at \*6 (S.D.N.Y. Sept. 29, 2017). [3]

3     Citations in the form "A. ___," "S.A. ___," and "D.J.A. ___" are to Appellants' Appendix, Appellants' Special Appendix, and Defendants-Appellees-Cross-Appellants' Appendix, respectively.

### B. Defendants' Motion to Dismiss

On September 29, 2017, the district court granted Defendants' motion to dismiss in part as to several claims, but it held that Plaintiffs plausibly alleged that Defendants failed to monitor recordkeeping fees and underperforming funds. The court dismissed the duty of loyalty claims in Counts I, III, and V, as well as the duty of prudence claim in Count I. The court also dismissed the prohibited transactions claims in Counts II, IV, and VI. In addition, the court dismissed Count III as to CAPTRUST. Within Count V, the district court found that certain allegations encompassed by the count (allegations 4, 5, and 6, as identified above) failed plausibly to allege a breach of the duty of prudence and accordingly dismissed them. This left within Count V only the claim premised on the retention of certain investments (allegations 1 and 2) and the share-class claim (allegation 3).

Thus, at that stage, the surviving claims were the duty of prudence claim in Count III as to the Cornell Defendants, the duty of prudence claim in Count V as to both the Cornell Defendants and CAPTRUST, and the duty to monitor claim in Count VII as to Cornell and Opperman. With regard to Count VII, the district court noted, however, that "the duty to monitor claim is only as broad as the surviving prudence claims and is otherwise dismissed." S.A. 77.

### C. Defendants' Motion for Summary Judgment

On September 27, 2019, the district court granted summary judgment for Defendants on nearly all the remaining claims. On the duty of prudence claim in **\*972** Count III, relating to the recordkeeping fees, the district court found that material issues of fact remained as to whether the Cornell Defendants breached their duty of prudence. However, because Plaintiffs did not present evidence of loss and abandoned any request for equitable relief, the district court granted summary judgment to the Cornell Defendants on Count III.

**\*\*5**  On the duty of prudence claim in Count V, the district court awarded summary judgment to the Cornell Defendants and CAPTRUST for the retention-of-certain-investments claim. The court also awarded summary judgment to CAPTRUST on the share-class claim in its entirety and to Cornell on the share-class claim with the exception of Plaintiffs' claim that Cornell breached the duty of prudence by failing to swap out the retail TIAA-CREF Lifecycle target date funds for their identical institutional share-class funds. By awarding summary judgment to Defendants on most of Counts III and V, the district court also disposed of what remained of Count VII, which the district court had deemed to be derivative of the other claims. Thus, following the district court's summary judgment decision, all that remained was the duty of prudence claim against Cornell relating to the failure to adopt a lower-cost share class of the TIAA-CREF Lifecycle target date funds.

On December 22, 2020, the district court approved the parties' settlement of that remaining portion of the case. This appeal followed.

### DISCUSSION

On appeal, Plaintiffs contend that the district court erred in granting in part both Defendants' motion to dismiss and Defendants' motion for summary judgment. Regarding the dismissed claims, Plaintiffs argue that Count IV of the Complaint stated a plausible claim that Cornell [4] caused the Plans to enter into prohibited transactions involving the Plans' recordkeepers, and that the district court erred in dismissing portions of Count V. [5] In addition, Plaintiffs challenge the district court's grant of summary judgment to Defendants on Counts III and V. In particular, as to Count III, Plaintiffs argue that the district court erred in holding that Plaintiffs had the burden of proving loss resulting from the alleged fiduciary breach. We first address the dismissed claims, and then turn to the district court's grant of partial summary judgment.

[4]  Throughout their briefs, the parties refer to "Cornell" without distinguishing between Cornell University as an individual party and the collective "Cornell Defendants." Because the distinction does not affect our analysis, we do the same except where explicitly noted.

[5]  Plaintiffs do not appeal the dismissal of Counts I, II, VI, and VII. Accordingly, we do not address these claims.

### I. Dismissed Claims

We review a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiffs contend on appeal that the district court erred in dismissing their prohibited transactions claim for failure to **\*973** state a claim and in parsing Count V by dismissing certain allegations that Defendants breached their duty of prudence. We address each of Plaintiffs' claims in turn.

#### A. Dismissal of Prohibited Transactions Claim (Count IV)

Plaintiffs challenge the district court's dismissal of their allegation, in Count IV, that Cornell violated 29 U.S.C. § 1106(a)(1)(C) by causing the Plans to engage in prohibited transactions with its recordkeepers, TIAA-CREF and Fidelity. Section 1106,

entitled "Prohibited Transactions," consists of three provisions restricting the set of transactions in which plan fiduciaries may engage, two of which are relevant here: § 1106(b) "codifie[s]" certain core tenets of the duty of loyalty "by prohibiting [a plan's fiduciary from engaging in] transactions tainted by a conflict of interest and thus highly susceptible to self-dealing," *Lowen*, 829 F.2d at 1213, while § 1106(a) "supplements the fiduciary's general duty of loyalty ... by categorically barring certain transactions" involving a "party in interest," *Harris Trust*, 530 U.S. at 241–42, 120 S.Ct. 2180 (quoting 29 U.S.C. § 1106(a)).

**\*6** Plaintiffs' claim is premised on this supplementary provision, § 1106(a), entitled "[t]ransactions between plan and party in interest," which provides, in relevant part:

Except as provided in section 1108 of this title:

> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> (B) lending of money or other extension of credit between the plan and a party in interest;
>
> (C) *furnishing of goods, services, or facilities between the plan and a party in interest*;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>
> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a)(1) (emphasis added). In turn, ERISA defines a "party in interest" of an employee benefit plan to include "a person providing services to such plan." *Id.* § 1002(14)(B).

Section 1108, which, as reflected above, is expressly referenced in the text of § 1106(a), then provides certain "[e]xemptions from prohibited transactions," including, as relevant here, § 1108(b)(2)(A), which permits "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." *Id.* § 1108(b)(2)(A).

Reading § 1106(a)(1)(C) in isolation of the exemptions in § 1108, ERISA would appear to prohibit payments by a plan to any entity providing it with any services. Invoking the precept that "[a] statute should be interpreted in a way that avoids absurd results," *United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) (quoting *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000)), "[s]everal courts," including the Third, Tenth, and Seventh Circuits, "have declined to read ERISA [in this manner] because it would prohibit fiduciaries from paying third parties to perform essential services in support of a plan," including "recordkeeping and administrative services," *Albert v. Oshkosh Corp.*, 47 F.4th 570, 584–85 (7th Cir. 2022). The courts to follow this tact have adopted different means of narrowing the statute. **\*974** The Third Circuit, in *Sweda v. University of Pennsylvania*, read the provision to require allegation of "an element of intent to benefit a party in interest." 923 F.3d at 338. The Tenth Circuit, in *Ramos v. Banner Health*, limited the statute's apparent scope by holding that "some prior relationship must exist between the fiduciary and the service provider to make the provider a party in interest under § 1106." 1 F.4th 769, 787 (10th Cir. 2021). And the Seventh Circuit, in *Albert*, held that, to state a claim, the alleged transaction must "look[ ] like self-dealing," as opposed to "routine payments for plan services." 47 F.4th at 585.

Two circuits, on the other hand, have embraced the expansive reading of the statute that these other circuits have rejected as absurd. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009); *Bugielski v. AT&T Servs., Inc.*, No. 21-56196, 2023 WL 4986499, at \*9–10 (9th Cir. Aug. 4, 2023). In *Braden*, the Eighth Circuit held that the plaintiffs had stated a claim under § 1106(a)(1)(C) by alleging that a plan sponsor caused the plan to enter into an agreement with a party in interest in which it received "undisclosed amounts of revenue sharing payments in exchange for services rendered to the [p]lan." 588 F.3d at

601. Notably, in reaching this conclusion, the court rejected the defendant's argument that § 1106(a)(1)(C) should be read to require an allegation that the compensation paid was unreasonable, explaining that the exemption for "reasonable compensation" paid for "necessary" services, reflected in § 1108(b)(2)(A) is an affirmative defense that need not be addressed in order for a complaint to survive a motion to dismiss. *Id.* Though acknowledging that this would require "ERISA fiduciaries ... to defend the reasonableness of every service provider transaction," the court reasoned that this result was justified by the language of the statute and traditional principles of trust law. *Id.* at 601–02. [6] Similarly, in *Bugielski*, the Ninth Circuit embraced what it characterized as a "literal reading" of § 1106(a)(1)(C), though—because the appeal arose from a grant of summary judgment—it did so without addressing whether the § 1108 exemptions are treated as affirmative defenses at the pleading stage. 2023 WL 4986499, at *10 (quoting *Albert*, 47 F.4th at 584).

[6] The Seventh Circuit, in *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016), later joined the Eighth Circuit in treating the § 1108 exemptions as affirmative defenses to § 1106(a), though, as discussed above, the court's subsequent opinion in *Albert* narrowed the scope of § 1106(a) to avoid what it characterized as the "absurd results" of this reading, 47 F.4th at 585.

**\*\*7** Following reasoning similar to that embraced by the Third, Tenth, and Seventh Circuits, the district court here declined to read § 1106(a)(1)(C) expansively and instead concluded that to state a claim under this provision a complaint must allege that the challenged transaction involved "self-dealing or disloyal conduct." *Cunningham*, 2017 WL 4358769, at *10 (internal quotation marks omitted). Holding that Plaintiffs' Complaint failed to make such allegations adequately, the district court dismissed the prohibited transaction claims, including Count IV. On appeal, Plaintiffs urge this Court to reject the district court's interpretation of the statute and instead adopt the Eighth and Ninth Circuits' more expansive reading. [7]

[7] In support of their argument, Plaintiffs cite the preamble of a regulation not implicated here which broadly summarizes the structure of §§ 1106 and 1108. *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632, 5632 (Feb. 3, 2012). Because this prefatory text does not, in our view, bear on the issue of what conduct is prohibited by § 1106(a)(1)(C), we need not address what, if any, deference ought to be accorded to the agency's interpretation. In any case, to the extent this regulatory language is relevant, it supports our conclusion that § 1106(a)(1)(C) does not require explicit allegations of self-dealing.

**\*975** We agree—but only in part. While we agree that the language of § 1106(a)(1) cannot be read to demand explicit allegations of "self-dealing or disloyal conduct," we do not agree with the Eighth Circuit that, at the pleadings stage, the § 1108 exemptions should be understood merely as affirmative defenses to the conduct proscribed in § 1106(a). To the contrary, we conclude that at least some of those exemptions—particularly, the exemption for reasonable and necessary transactions codified by § 1108(b)(2)(A)—are incorporated into § 1106(a)'s prohibitions. And, accordingly, we hold that to plead a violation of § 1106(a)(1)(C), a complaint must plausibly allege that a fiduciary has caused the plan to engage in a transaction that constitutes the "furnishing of ... services ... between the plan and a party in interest" *where that transaction was unnecessary or involved unreasonable compensation*. 29 U.S.C. §§ 1106(a)(1)(C), 1108(b)(2)(A).

Our reading flows directly from the text and structure of the statute. The text of § 1106(a) begins with the carveout: "Except as provided in section 1108 of this title ...." 29 U.S.C. § 1106(a). Thus, the exemptions set out in § 1108—including, most pertinently, the exemption for "reasonable compensation" paid for "necessary" services, § 1108(b)(2)(A)—are incorporated directly into § 1106(a)'s definition of prohibited transactions. This is in contrast to the language of § 1106(b), governing "[t]ransactions between plan and fiduciary," which makes no direct reference to the § 1108 exemptions in setting out the scope of the transactions it prohibits. *See id.* § 1106(b). Thus, while § 1106(a) explicitly incorporates the § 1108 exemptions, that those exemptions also extend to § 1106(b), to the extent they do, is signaled only by the text of § 1108. *See id.* § 1108(b) ("[T]he prohibitions provided in section 1106 of this title shall not apply to any of the following transactions ...."); *see also Mendez v. Barr*, 960 F.3d 80, 87 (2d Cir. 2020) ("[W]hen Congress uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (internal quotation marks omitted)).

This difference is significant in light of the "familiar principle[s]" that guide our interpretation of statutory text. *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 91, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008). Typically, when a statute is drafted "with exemptions laid out apart from the prohibitions," the exemptions are understood to serve as defenses that must be raised affirmatively by the defendant. *Id.* However, that presumption does not apply when the exemptions are incorporated directly into the text of the relevant provision. See *United States v. Vuitch*, 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971) ("[W]hen an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception."); see also *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 183 (2d Cir. 2014) (holding that a plaintiff alleging a violation of the Fair Debt Collection Practices Act must plead that an exception to the definition of a debt collector does not apply). Thus, the fact that Congress drafted § 1106(a)—but not § 1106(b)—to reference the § 1108 exemptions supports the view that the burden of raising those exemptions lies, at least in part, with the plaintiff.

**\*\*8** Further support for this view arises from the role the exceptions play in articulating the nature of the prohibited conduct. Typically, when "a statutory prohibition **\*976** is broad and an exception is quite narrow, it is more probable that the exception constitutes an affirmative defense." *United States v. Durrani*, 835 F.2d 410, 421 (2d Cir. 1987). However, when "the exception [is] not narrow," such that it can be "presumed in most cases" that the exemption will ultimately remove the challenged conduct from the prohibition's scope, the logical inference cuts in the opposite direction. *United States v. Carey*, 929 F.3d 1092, 1103 (9th Cir. 2019). In such cases, the exception is so "integral ... to the offense" that it is "part of the offense's 'ingredients.' " *Id.* at 1101. As the Supreme Court articulated in the criminal context long ago, "[w]here a statute defining an offense contains an exception," the pleadings must allege that the conduct at issue does not fall within the exception whenever the exception "is so incorporated with the language defining the offense that the ingredients of the offense cannot be accurately and clearly described if the exception is omitted." *United States v. Cook*, 84 U.S. (17 Wall.) 168, 173, 21 L.Ed. 538 (1872). In other words, when one cannot articulate what the statute seeks to prohibit without reference to the exception, then the exception should be understood as part of the definition of the prohibited conduct—and thus its inapplicability must be pled.

In our view, this is such a statute. Section § 1106(a) seeks to prohibit transactions that "involve uses of plan assets that are potentially harmful to the plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). And yet, when read in isolation from its exemptions, § 1106(a) would encompass a vast array of routine transactions the prohibition of which cannot be consistent with that statutory purpose. [8] To the contrary, if all payments by plan fiduciaries to third parties in exchange for plan services were presumptively prohibited, then the plan would be severely compromised: "Employee benefit plans would no longer be able to outsource tasks like recordkeeping, investment management, or investment advising, which in all likelihood would result in lower returns for employees and higher costs for plan administration." *Albert*, 47 F.4th at 586. [9] Such a result would be inconsistent with the Supreme Court's "recogni[tion] that ERISA represents a careful balancing" intended to "induce[ ] employers to offer benefits by assuring a predictable set of liabilities." **\*977** *Conkright v. Frommert*, 559 U.S. 506, 517, 130 S.Ct. 1640, 176 L.Ed.2d 469 (2010) (internal quotation marks omitted).

[8]    Relatedly, when read in such an expansive manner, § 1106(a) would pull within its scope various transactions that would not ultimately be deemed prohibited once the exemptions are considered, thus creating tension with the section's heading: "Prohibited Transactions." See 29. U.S.C. § 1106. As the Supreme Court recently remarked, "[t]he title of a statute and the heading of a section" have "long [been] considered" to be "tools available for the resolution of a doubt about the meaning of a statute." *Dubin v. United States*, 599 U.S. 110, 143 S. Ct. 1557, 1567, 216 L.Ed.2d 136 (2023) (internal quotation marks omitted). Reliance on a section heading is particularly appropriate where, as is the case here, the text of the heading was enacted along with the statutory text, see ERISA, Pub. L. 93-406, § 406, 88 Stat. 829, 879 (codified as 29. U.S.C. § 1106), as opposed to added later during the codification process, see Daniel B. Listwa, Comment, *Uncovering the Codifier's Canon: How Codification Informs Interpretation*, 127 YALE L.J. 464, 475–76 (2017) (explaining this distinction).

[9]    A prohibition on such outsourcing would also create tension with other provisions in ERISA. For example, under § 1104(a)(1)(A), a fiduciary must discharge his duties solely in the interests of the participants and their beneficiaries and for the exclusive purpose of "providing benefits to participants and their beneficiaries" and "defraying reasonable

expenses of administering the plan," thus seemingly contemplating that there would be expenses associated with plan administration. 29 U.S.C. § 1104(a)(1)(A).

The broad scope of § 1106(a) thus places greater weight on the § 1108 exemptions, in particular § 1108(b)(2)(A), to limit the scope of the statute's prohibitions to only those transactions that actually present a risk of harm to the plan and raise the sort of concerns implicated by the duty of loyalty—the duty § 1106(a) has been held to "supplement[ ]." *Harris Trust*, 530 U.S. at 241–42, 120 S.Ct. 2180. This is because, while it is true that a fee "so disproportionately large that it bears no reasonable relationship to the services rendered" raises an inference that it was not "the product of arm's length bargaining," *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346, 130 S.Ct. 1418, 176 L.Ed.2d 265 (2010) (discussing an analogous provision of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b)), the same cannot be said of routine payments made to service providers. *Cf. In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 748–49 (Del. Ch. 2005) (explaining that an inference of "bad faith"—and thus of breach of the duty of loyalty—is permissible when the transaction is one in which "no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration"), *aff'd*, 906 A.2d 27 (Del. 2006). By contrast, § 1106(b) on its face is restricted only to transactions carrying indicia of a conflict of interest—and, as already noted, does not directly incorporate the § 1108 exemptions. *See* 29 U.S.C. § 1106(b).

**\*9** Put simply, when read on its own, § 1106(a)—and in particular, § 1106(a)(1)(C), which addresses the "furnishing of goods, services, or facilities between the plan and a party in interest"—is missing an "ingredient[ ] of the offense." *Cook*, 84 U.S. (17 Wall.) at 173. That ingredient is the exemption for "reasonable compensation" paid for "necessary" services, reflected in § 1108(b)(2)(A). It is only by incorporating that exemption into the prohibition set out in § 1106(a)(1)(C), and thus limiting its reach to unnecessary or unreasonable compensation, that the offensive conduct the statute discourages can "be accurately and clearly described." *Cook*, 84 U.S. (17 Wall.) at 174.

In reaching this decision, we leave undisturbed our prior decisions holding that it is ultimately the defendant fiduciary that bears the burden of persuasion with regard to the applicability of the § 1108 exemptions. *See Lowen*, 829 F.2d at 1215 ("We believe that a fiduciary charged with a violation of Section 406(b)(3) ... must prove by a preponderance of the evidence that the transaction in question fell within an exemption."); *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618–19 (2d Cir. 2006) ("Under ERISA, the fiduciary bears the burden of proving by a preponderance of the evidence that the [plan] received 'adequate consideration' [pursuant to 29 U.S.C. § 1108(e)] for its purchase of company stock" where the seller was a "party in interest.")

As we explained in *Lowen*, when construing ERISA's provisions, we look to "common law rules regarding trustees" for guidance, and, under such rules, it is typically the fiduciary—with better access to "information concerning the transaction in question" and thus "in the best position to demonstrate the absence of self-dealing"—who ultimately bears the burden of proving the fairness of the transaction. 829 F.2d at 1215; *see also Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978) ("The settled law is that in such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness."). But, "[i]n the law of trusts," before the burden shifts to the defendant, it falls on the "beneficiaries [to] establish[ ] **\*978** their *prima facie* case by demonstrating the trustees' breach of fiduciary duty." *N.Y. State Teamsters Council Health & Hosp. Fund v. Est. of DePerno*, 18 F.3d 179, 182 (2d Cir. 1994). In the present case, where Congress has "supplement[ed] the fiduciary's general duty of loyalty" with enumerated prohibitions on certain types of transactions, *Harris Trust*, 530 U.S. at 241–42, 120 S.Ct. 2180, it follows that while the fiduciary retains the ultimate burden of proving the appropriateness of the transaction pursuant to § 1108(b)(2)(A), it falls on the plaintiff in the first instance to allege—and, at the summary judgment stage, to produce evidence of—facts calling into question the fiduciary's loyalty by challenging the necessity of the transaction or the reasonableness of the compensation provided. [10]

10  Accordingly, this case presents an example of the fact that, particularly with regard to statutory regimes where the "exceptions ... are numerous," "[t]he burden[ ] of proof will not always follow the burden of pleading." 2 MCCORMICK ON EVID. § 337 (8th ed.).

Turning to the allegations of Count IV, Plaintiffs allege simply that "[b]ecause TIAA and Fidelity are service providers and hence 'part[ies] in interest,' their 'furnishing of' recordkeeping and administrative services to the Plans is a prohibited transaction

unless Cornell proves an exemption." Appellants' Br. at 61 (quoting 29 U.S.C. §§ 1106(a)(1), 1108(b)(2)(A)). But, as we have explained, it falls on Plaintiffs—not Cornell—to allege in the first instance that the transactions were unnecessary or that the compensation was unreasonable. Plaintiffs have done neither.

**\*\*10** Our conclusion is unchanged when we look—as Plaintiffs ask us to do in the alternative—beyond the allegations of Count IV and to those of Count III, which asserts a claim that Cornell breached the duty of prudence by allowing the Plans to pay unreasonable administrative fees. While Plaintiffs have alleged several forms of procedural deficiencies with regard to recordkeeping, their complaint does not plausibly allege that the compensation was itself unreasonable. For example, Plaintiffs claim that Cornell failed to seek bids from other recordkeepers and neglected to monitor the amount of revenue sharing received by TIAA-CREF and Fidelity. Such process-oriented allegations may well be sufficient to state claim for a breach of the duty of prudence, as the district court here found, but they cannot sustain a claim pursuant to § 1106(a)(1)(C) and § 1108(b)(2)(A).

Closer, yet still insufficient, are Plaintiffs' allegations that the Plans paid substantially more than what the Complaint identified as a "reasonable recordkeeping fee." A. 111. According to the Complaint, "a reasonable recordkeeping fee for the Plans would have been $1,050,000 in the aggregate for both Plans combined," calculated using "a flat fee based on $35 per participant." *Id.* The Plans allegedly paid many times more than that: Plaintiffs alleged that "the Retirement Plan paid between $2.9 and $3.4 million (or approximately $115 to $183 per participant) per year from 2010 to 2014" and "the TDA Plan paid between $1.8 and $2.2 million (or approximately $145 to $200 per participant) per year from 2010 to 2014." A. 111–12. But it is not enough to allege that the fees were higher than some theoretical alternative service. Whether fees are excessive or not is relative "to the services rendered," *Jones,* 559 U.S. at 346, 130 S.Ct. 1418, and it is not unreasonable to pay more for superior services. Yet, here, Plaintiffs have failed to allege any facts going to the relative quality of the recordkeeping services provided, let alone facts that would suggest the fees were "so disproportionately large" that they "could not have been the product of arm's-length **\*979** bargaining." *Id.* Consequently, we affirm the district court's dismissal of Count IV.

### B. "Parsing" of Count V

Plaintiffs also argue that the district court improperly parsed Count V at the motion-to-dismiss stage by separately addressing each of the six categories of allegations made in connection with the count and holding that only two—those relating to the retention of certain high-cost investment options and those relating to the share-class claim—succeeded in stating claims, while dismissing the others. When a "complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA," the question on a motion to dismiss is whether those particular allegations "give rise to a 'reasonable inference' that the defendant committed the alleged misconduct." *PBGC,* 712 F.3d at 718–19 (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937) (emphasis omitted). This evaluation "requires assessing 'the allegations of the complaint as a whole' " and drawing all "reasonable inference[s]" in the plaintiff's favor. *Id.* at 719 (quoting *Matrixx Initiatives Inc. v. Siracusano,* 563 U.S. 27, 47, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011)). Where, as here, a plaintiff's claim of breach depends on a fiduciary's process in managing a plan, a court may appropriately find that the allegations "considered as a whole" state a claim for relief even if no single allegation "directly addresses the process." *Braden,* 588 F.3d at 596.

But the imperative that a court consider the complaint "as a whole" does not mean that in all cases the entirety of any particular count must stand or fall as one. Far from it. Under the Federal Rules of Civil Procedure, "a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency." *Henry v. Daytop Vill., Inc.,* 42 F.3d 89, 95 (2d Cir. 1994) (citing Fed. R. Civ. P. 8(e)(2) (1987) (current version at Fed. R. Civ. P. 8(d)(2))); *see* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."). Thus, in a single count, a plaintiff may plead multiple—sometimes contradictory—theories of liability. When that is the case, it is incumbent on the court to address each theory on its own merit, separating out as necessary the allegations underlying the various claims. *See, e.g., Rinehart v. Lehman Bros. Holdings Inc.,* 817 F.3d 56, 66–67 (2d Cir. 2016) (noting that "[p]laintiffs allege in Count II" two different "theor[ies]" of imprudence and assessing each theory separately). That is precisely what the district court did in this case when it assessed individually each of the categories of allegations included in Count V

to determine whether any supported an inference that there were flaws in Defendants' processes that could, in turn, give rise to a cause of action for fiduciary breach.

**\*\*11** In challenging the district court's evaluation, Plaintiffs misunderstand the limited nature of the district court's dismissal order. Central to Plaintiffs' contention of error is their argument that by dismissing the allegations relating to Cornell's alleged failure to streamline the investment menus and to engage in adequate monitoring (the fifth and sixth categories of allegations in Count V, respectively), the district court precluded consideration of relevant pieces of "circumstantial evidence supporting the overall claim in Count V that Defendants had a flawed investment-review process." Appellants' Br. at 23. But that is not what the district court did. The district court's summary judgment decision, as well as its Rule 37 order denying Defendants' motion to exclude evidence purportedly unrelated to the non-dismissed allegations, made clear that the court's determination at the **\*980** motion-to-dismiss stage was essentially limited to rejecting claims that breaches of "a procedural duty" could support a claim for relief even in the absence of allegations of harm resulting to the plan and its participants. *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2019 WL 4735876, at \*11 (S.D.N.Y. Sept. 27, 2019) (quoting *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114 (S.D.N.Y. 2018), *aff'd sub nom. O'Day v. Chatila*, 774 F. App'x 708 (2d Cir. 2019)); *see also Cunningham*, 2017 WL 4358769, at \*6 ("[W]hile plaintiffs claim that the Plans offered too many options to participants, they do not allege that any plan participant was actually harmed by defendants' failure to reduce the number of options available.").

Significantly, the district court did not preclude Plaintiffs from relying on evidence related to those alleged procedural errors to support its theory of breach and loss premised on the retention of imprudent investment options. To the contrary, in ruling on summary judgment, the district court extensively discussed the evidence of Defendants' putative deficiencies in monitoring the Plans' options and their retention of numerous investment options in addressing whether Defendants had acted imprudently in not removing various underperforming funds. *Cunningham*, 2019 WL 4735876, at \*11–16. In this context, it is clear that the district court's decision on the motion to dismiss was not an improper "parsing" of Count V, but rather a refining of it so as to identify clearly the theories upon which Plaintiffs had stated a claim. We accordingly find no merit in Plaintiffs' objections to the district court's evaluation of Count V at the motion-to-dismiss stage.

### II. Grant of Summary Judgment

"We review a grant of summary judgment *de novo* and may affirm on any basis that finds support in the record." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (internal citations omitted). Summary judgment is appropriate "only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 108 (2d Cir. 2006), *aff'd*, 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008); *see also* Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether summary judgment is appropriate, we must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79–80 (2d Cir. 2009) (internal quotation marks omitted).

Plaintiffs contend on appeal that the district court erred in granting summary judgment to Defendants on the duty of prudence claim in Count III, premised on recordkeeping fees, and those duty of prudence claims in Count V that survived the motion to dismiss, premised on the retention of underperforming investment options and on the failure to transition to lower-cost institutional shares.[11] We address each of Plaintiffs' claims in turn.

---

[11] As discussed *supra*, the district court granted only partial summary judgment on Count V.

### **\*981** A. Recordkeeping Fees Claim (Count III)

Plaintiffs argue that the district court erred in awarding summary judgment to the Cornell Defendants on Plaintiffs' claim that they breached their duty of prudence by failing to monitor and control the recordkeeping fees paid to TIAA and Fidelity. In particular, Plaintiffs argue that the Cornell Defendants acted imprudently by failing (1) to determine whether the amount of revenue sharing with the recordkeepers was competitive or reasonable; (2) to solicit bids from competing recordkeepers on a flat fee or per participant basis; and (3) to engage in a reasoned decision-making process to determine whether the Plans should move to a single recordkeeper. The district court concluded that genuine issues of material fact remained with respect to whether the Cornell Defendants breached the duty of prudence, but nevertheless granted summary judgment in favor of the Cornell Defendants because Plaintiffs failed to establish that any breach resulted in loss. *Cunningham*, 2019 WL 4735876, at *5–7. Because we agree that Plaintiffs failed to meet their burden as to loss, we affirm. [12]

[12] Having concluded that Plaintiffs did not meet their burden regarding loss, we do not address the district court's determination that genuine issues of material fact precluded summary judgment on whether the Cornell Defendants breached the duty of prudence.

**\*\*12** To obtain damages for a fiduciary breach pursuant to 29 U.S.C. § 1104(a), it is not enough to show that the defendant's conduct failed to meet the high standard erected by the duty of prudence; the plaintiff must also prove that a "loss resulted from that failure." *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998); *see* 29 U.S.C. § 1109(a) ("Any person who is a fiduciary ... shall be personally liable to make good to [the] plan any losses to the plan resulting from [a] breach."). "Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been [operated] like other funds being [properly operated] during the same period." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016) (internal quotation marks and citation omitted). However, in recognition of the "superior access to information" the fiduciary commonly has, when a plaintiff alleges excessive fees, we do not require that the plaintiff prove that the "alternative fee ranges" established by the plaintiff are "the *only* plausible or prudent ones." *Sacerdote v. New York Univ.*, 9 F.4th 95, 113 (2d Cir. 2021) (citation omitted). Instead, once the plaintiff has "prove[n] that the charged fees were imprudent," in the sense that the charges were the result of the fiduciary's imprudent actions, and "shown a prudent alternative," "the burden under ERISA shifts to the defendant[ ] to disprove any portion of potential damages by showing that the loss was not caused by the breach of fiduciary duty"—that is, by showing that some or all of the loss would have still occurred had "the fiduciary ... not breached its duty." *Id.* [13]

[13] Though some of our sister circuits have described this burden-shifting regime in terms of the distinction between the elements of "loss" and "causation," *see, e.g.*, *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 33 (1st Cir. 2018), we have generally refrained from doing so because of the confusion such terminology may generate in cases concerning one fiduciary's liability for losses relating to another fiduciary's actions, *see Silverman*, 138 F.3d at 106 (Jacobs, J., with Meskill, J., concurring) (noting that requiring the plaintiff to prove causation served as a check on the "broadly sweeping liability" of a new fiduciary for plan losses caused by a prior fiduciary's breaches).

**\*982** On appeal, Plaintiffs contend that, having advocated a genuine dispute regarding the Cornell Defendants' breach of duty, they need only "show an expenditure for recordkeeping fees" to "establish a genuine dispute regarding loss." Appellants' Br. at 51. Mere proof that "the Plans paid TIAA and Fidelity recordkeeping fees (though the exact amount is disputed)" is all Plaintiffs argue they must show to make out their *prima facie* claim. *Id.* This misunderstands our precedent. While it is true that Defendants ultimately bear the burden of proof as to the objective reasonableness of improvidently paid fees, Plaintiffs must do more than establish only that some payment was made; they must also show, at a minimum, that there was a "prudent alternative" to the allegedly imprudent fees paid. *Sacerdote*, 9 F.4th at 113. That is, Plaintiffs must provide evidence of a "suitable benchmark[ ]" against which loss could be measured. *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 34 (1st Cir. 2018). This they have not done.

At the summary judgment stage, Plaintiffs sought to establish loss primarily through the testimony of two putative experts on the subject of the market for contribution plan recordkeeping, Al Otto and Ty Minnich. Both declared that, in their "experience," a reasonable recordkeeping rate for the Plans would have been $35 to $40 per participant. *Cunningham*, 2019 WL 4735876, at *9–10. But neither offered any cognizable methodology in support of their conclusions, instead simply referencing their knowledge

of the relevant industry and a few examples of other university plans that paid lower fees, though without explaining how these putative comparators were selected. Given these deficiencies, the district court did not abuse its discretion in excluding Otto's and Minnich's testimony on the recordkeeping fees. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) ("If the opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] and Rule 702 [of the Federal Rules of Evidence] mandate the exclusion of that unreliable opinion testimony." (internal quotation marks omitted)).

**\*\*13** After the exclusion of Plaintiffs' expert testimony, what remains are numerical data from TIAA and CAPTRUST—scattered numbers of plan participants, assets, and recordkeeping fees for certain plans—which are insufficient standing alone to show loss. In particular, Plaintiffs cite (1) TIAA's pricing data showing the Plans paid fees higher than the 25th percentile of TIAA's "200 largest clients," A. 2167, 2301–02, and (2) CAPTRUST's data identifying a handful of plans with over 10,000 participants that paid lower recordkeeping fees than the Plans based on certain measures, A. 2303, 2496. But a district court is not required to "scour the record" to find losses. *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013) (internal quotation marks omitted). And, as the district court explained, absent admissible "expert testimony opining on why [these data are] based upon relevant comparators or would lead a reasonable juror to conclude that Cornell could have achieved lower fees," *Cunningham*, 2019 WL 4735876, at \*6, such data are not enough, on their own, to establish a "prudent alternative" fee, *Sacerdote*, 9 F.4th at 113, or otherwise prove loss.

Accordingly, having concluded that Plaintiffs' evidence was insufficient to demonstrate a genuine dispute of material fact as to whether the Plans suffered loss, we affirm the award of summary judgment to the Cornell Defendants on Count III.[14]

[14] In the alternative, Plaintiffs argue that it was improper for the district court to grant summary judgment on Count III based on the failure to show loss because, in addition to seeking damages, Plaintiffs sought equitable relief, including reformation of the Plans to require bids for recordkeeping. *See Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir. 1987). However, as the district court noted, Plaintiffs failed to make this argument below and thus can be inferred to have abandoned it. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may ... infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned"); *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 68 (2d Cir. 2010) ("An argument raised for the first time on appeal is typically forfeited.").

**\*983 B. Retention of Certain Investment Options Claim (Count V)**

Next, Plaintiffs challenge the district court's grant of summary judgment to Defendants on the claim, found in Count V, that Cornell and CAPTRUST employed a flawed process in reviewing the set of investment options made available through the Plans and, as a result, failed to remove underperforming options. Plaintiffs' theory of liability separates the class period into two parts, with the dividing line being July 2013, when CAPTRUST presented the RPOC with a quantitative assessment of the Plans' investment options.

As to the pre-July 2013 period, Plaintiffs argue that Cornell lacked a sufficient process for reviewing the performance of the investment options, instead relying on the "opinions of conflicted non-fiduciary third parties (TIAA and Fidelity) as to whether their proprietary investments complied with ERISA." Appellants' Br. at 33. As to the post-July 2013 period, Plaintiffs largely take issue with what they characterize as a five-year delay on the part of the RPOC to act on CAPTRUST's identification of underperforming funds. They also argue that CAPTRUST breached its duties by "fail[ing] to review the Plans' investments for the first 19 months of its tenure" and then conducting a review that "was of generally lower quality than its work for other clients." *Id.* at 34–35. Because we conclude that a review of the record fails to reveal sufficient evidence for a rational trier of fact to find in Plaintiffs' favor on any of these theories, we affirm the district court's grant of summary judgment to Defendants on this claim.

To establish a breach of the duty of prudence, a plaintiff must, as discussed above, show that the fiduciary's conduct fell below the "[p]rudent man standard of care." 29 U.S.C. § 1104(a). An ERISA fiduciary acts imprudently "by failing to properly monitor investments and remove imprudent ones." *Tibble*, 575 U.S. at 530, 135 S.Ct. 1823. Accordingly, "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options" and they must "remove [any] imprudent investment from the plan within a reasonable time." *Hughes v. Nw. Univ.*, 595 U.S. 170, 142 S. Ct. 737, 742, 211 L.Ed.2d 558 (2022).

**\*\*14** That said, "[b]ecause the content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014) (quoting 29 U.S.C. § 1104(a)(1)(B)). Moreover, "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742. So, when we ask "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment," we do so "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of **\*984** hindsight." *PBGC*, 712 F.3d at 716 (internal quotation marks and citations omitted).

Given this context-sensitive inquiry, we conclude that no reasonable trier of fact could determine that Cornell's process was flawed such that Cornell violated its duty of prudence. Turning first to the pre-July 2013 period, Plaintiffs have failed to put forward any evidence suggesting that Cornell's process for evaluating the performance of its investment line-up fell below the then-prevailing fiduciary standard. While Cornell's oversight did improve with time, it had processes to review the Plan's investment options at all points during the class period. As Paul Bursic, the Senior Director of the Benefits Department, testified, Cornell's Benefits Department regularly "received and reviewed detailed performance and investment disclosures for all the plans' investment options"—prior to the RPOC's formation—which were prepared by TIAA and Fidelity and included "performance benchmarking information." D.J.A. 283. In addition to distributing these disclosures to plan participants, *id.*, the Benefits Department used them to identify "potential problems," such as "funds that may be in trouble," D.J.A. 194. Though Bursic acknowledged that this level of monitoring may fall below the expectations for plan fiduciaries today, he testified that it was consistent with then-prevailing standards, *see* D.J.A. 193—a point that Plaintiffs' evidence does not refute.[15]

[15] Indeed, though we do not rely on it, we observe that the fact that Plaintiffs' counsel have brought claims premised on similar purported process failures against numerous other university plan fiduciaries, *see* Petition for Writ of Certiorari at 8, *Hughes*, 142 S. Ct. 737 (No. 19-1401) (noting that the actions against various university 403(b) plans have all involved "substantively identical" allegations), tends to undermine the argument that such processes fell below the then-prevailing fiduciary standard.

After the Internal Revenue Service updated its regulations on 403(b) plans, Cornell formed the RPOC for the purpose of enhancing oversight of the plans. Cornell then engaged CAPTRUST as an outside consultant and launched a multi-year process focused on redesigning and streamlining the investment menu. The process, unsurprisingly, took time to implement. Initially, there was a "set-up period" during which Cornell "continued to do [its] work as [it] had for years before through the Benefits [Department]," while also developing an Investment Policy Statement ("IPS") with CAPTRUST to guide the evaluation of investment options going forward. A. 1007, 1056–60. Once the IPS was approved in late 2012, Cornell initiated a much more systematized and in-depth review of the investment options, beginning in earnest with CAPTRUST's presentation of its performance analysis in July 2013.

In this context, Cornell considered not only CAPTRUST's bottom-line recommendations, but also the quantitative and qualitative criteria described in the IPS, the availability of options among peer institutions, and the popularity of options among plan participants in developing a revised menu of investment options. With regard to the post-July 2013 period, Plaintiffs accuse Cornell of merely "passively accept[ing]" CAPTRUST's proposal without engaging more deeply in the monitoring process. Appellants' Br. at 37. But, as the district court explained, such an accusation is inconsistent with the record. The undisputed

evidence shows that the RPOC engaged critically with CAPTRUST's presentation, asking questions and, at times, expressing concerns about CAPTRUST's methodologies for evaluating particular investments.

**\*\*15** Cornell's review of the Plans ultimately led to the rollout of a new investment **\*985** menu beginning in 2017. Plaintiffs argue that this delay in removing the underperforming investment options fell below the fiduciary standard. But, given ERISA's command to evaluate a fiduciary's actions "based upon information available to the fiduciary at the time of" the decision, *PBGC*, 712 F.3d at 716, we conclude there is no genuine dispute at to whether Cornell acted to streamline the investment menu "within a reasonable time," *Hughes*, 142 S. Ct. at 742. As Plaintiffs acknowledge, the delay in rolling out the streamlined investment menu was largely due to the time the RPOC took to assess the risk of disruption to participants associated with a drastic change to the investment lineup and to ensure that alternative investment options would still remain available to participants.

Though Plaintiffs dismiss these concerns as "nonpecuniary goals" that an ERISA fiduciary should not be permitted to rely on, Appellants' Reply Br. at 24, we disagree. "An ERISA defined[-]contribution plan is designed to offer participants meaningful choices about how to invest their retirement savings." *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011). Accordingly, in the context of a defined-contribution plan, one "component of the duty of prudence" is "a fiduciary's obligation to assemble a diverse menu of options" for participants. *Hughes*, 142 S. Ct. at 741–42. It is thus consistent with the fiduciary's duty to take steps to ensure that participants' ability to make selections among "a broad range of investment alternatives," 29 C.F.R. § 2550.404c-(b)(3)(i), is not merely illusory.

We also conclude that no reasonable jury could find that CAPTRUST was imprudent in its conduct. Plaintiffs' allegations of delayed and deficient performance do not find support in the record. As discussed above, upon retention, CAPTRUST began working with Cornell to develop its process for reviewing investment-option performance, helping to create and then effectuate the IPS. Plaintiffs offer no evidence that it carried out these tasks in a subpar way, instead merely pointing out differences in the amount of detail between CAPTRUST's July 2013 presentation and an analysis provided to a different university. But Plaintiffs offer no reason to assign to this difference the significance they suggest. Accordingly, we affirm the district court's award of summary judgment to Defendants on this claim.

### C. Share Class Claim (Count V)

Finally, Plaintiffs argue that the district court erred in awarding partial summary judgment to the Cornell Defendants on the share-class claim. With regard to this claim, the district court concluded that issues of material fact precluded summary judgment as to whether Cornell violated its fiduciary duty by failing to swap out the higher-cost retail shares offered through the Plans for lower-cost, but otherwise identical, institutional shares. Nevertheless, the district court held that for all the funds other than one in particular—the TIAA-CREF Lifecycle fund—Plaintiffs had not come forward with evidence that the funds in question met the eligibility threshold for the lower-cost share classes, thus precluding any finding of loss attributable to Cornell's purported deficiencies. Accordingly, the court granted summary judgment to the Cornell Defendants except with regard to the Lifecycle fund. On appeal, Plaintiffs challenge the district court's conclusions regarding loss. In opposition, Cornell Defendants, in addition to defending the district court's loss holding, urge us to affirm on the alternative ground that Plaintiffs' evidence was insufficient to create a genuine issue as to whether Cornell acted imprudently. Because we **\*986** agree that Plaintiffs failed to produce evidence of imprudence, we affirm.

**\*\*16** In its summary judgment decision, the district court explained that Plaintiffs had presented evidence that, although TIAA began offering identical institutional share classes for its mutual funds to certain defined contribution plans in 2009, Cornell did not transition any of its funds to institutional shares with TIAA until early 2012. The district court held that this was sufficient evidence of imprudence, relying on its determination that "[t]here is no evidence in the form of affidavits or otherwise that anyone at Cornell attempted to transition to the institutional share class funds before February 22, 2012." *Cunningham*, 2019 WL 4735876, at \*17. But this analysis overlooked that Cornell did, in fact, present evidence that it had tried to effectuate such a transition but was rebuffed.

Specifically, according to his deposition testimony, prior to 2011, Bursic had "lobbied the president of TIAA" on numerous occasions to allow Cornell's Plans to transition to institutional shares, arguing that it was not appropriate for large plans like Cornell's to be paying the same fees as the much less sizable plans associated with small liberal arts colleges like nearby Ithaca College. D.J.A. 189. Bursic testified that although TIAA "very clearly and very firmly" denied the requests, he continued to "tr[y] very hard" to push for this change, even as Fidelity began to permit Cornell to transition to lower-cost share classes in 2010. D.J.A. 130, 136, 189–90. These efforts remained unsuccessful until 2012, when CAPTRUST became involved and helped Cornell negotiate a new contract with TIAA that capped the total revenue TIAA could collect from the Plans and had TIAA refund excess revenue to the Plans. [16]

[16] Additionally, though it was undisputed that TIAA began offering institutional share classes for its mutual funds in 2009 and that some non-Cornell 403(b) clients transitioned to using those share classes around that time, Plaintiffs did not identify any evidence supporting its contention that TIAA would have then considered the Plans to be eligible categorically for these types of shares. In particular, although Plaintiffs' Local Rule 56.1 statement asserted that all defined contribution plans were eligible for institutional share classes if they had over $2 million invested in most of the funds, the record evidence cited therein does not support this claim. *See* A. 954–60, 2303, 2377–78. On appeal, Plaintiffs have identified no alternative support for this proposition and, in any case, "[a] court is permitted to rely solely upon Local Rule 56.1 statements [and the materials cited therein] in deciding motions for summary judgment" and may do so "to the exclusion of other facts in the record." *Tompkins v. Metro-N. Commuter R.R. Co.*, 983 F.3d 74, 81 n.26 (2d Cir. 2020).

Given this evidence, a reasonable finder of fact could not conclude that Cornell could have forced, or should have tried harder to force, TIAA to offer the Plans the lower-cost share funds at an earlier date. Accordingly, we affirm the grant of summary judgment for Defendants on this claim.

## CONCLUSION

We have considered all of Plaintiffs' contentions on appeal and have found in them no basis for reversal. For the foregoing reasons, we AFFIRM the judgment of the district court. [17] Defendants' conditional cross-appeals are dismissed as moot.

[17] Because we do not remand any claims to the district court, Plaintiffs' arguments regarding the class period end date and Defendants' appeal of the district court's denial of Cornell's motion to strike Plaintiffs' jury demand are moot.

**All Citations**

86 F.4th 961, 2023 WL 7504142

---

End of Document                                               © 2023 Thomson Reuters. No claim to original U.S. Government Works.